## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN R. LEVINSON; RICHARD E. LAYTON; and DR. R. LAYTON PA 401(K) PLAN, | : : : | |
| Plaintiffs, | : : | Case No. 3:09-CV-00269 (PCD) |
| v. | : : | |
| PSCC SERVICES, INC.; WESTPORT NATIONAL BANK; TD BANKNORTH NA; DENNIS P. CLARK; and ROBERT L. SILVERMAN, | : : : : : | |
| Defendants. | : : | |

## <u>RULING ON DEFENDANTS' MOTION TO DISMISS</u>

This action arises out of the Ponzi scheme conducted by Bernie Madoff.  Two individuals and a pension and profit-sharing plan (collectively "Plaintiffs") have brought a class action complaint against Westport National Bank ("Westport") and TD Banknorth NA ("TD Banknorth"), the custodians of their retirement accounts; Dennis P. Clark ("Clark"), the Vice President of Westport; PSCC Services, Inc. ("PSCCSI"), Plaintiffs' pension consulting and actuarial firm; and Robert L. Silverman ("Silverman"), the President of PSCCSI (collectively "Defendants").  Plaintiffs and the class they seek to represent maintained custodial accounts with Westport and Westport B&T (TD Banknorth's predecessor) for their retirement funds.  Westport and Westport B&T operated a collective investment fund that was invested with Bernard L. Madoff ("Madoff").  After Madoff admitted his fraud and Plaintiffs realized that their retirement savings were lost, they commenced this class action.  The crux of Plaintiffs' allegations is that Defendants misled them into believing that their funds were safe and conservatively invested and

-1-

that Defendants ignored several red flags that should have alerted them of Madoff's Ponzi scheme.   Plaintiffs assert twelve causes of actions: 1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); 2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); 3) breach of the custodial agreements (against Westport and TD Banknorth only); 4) breach of fiduciary duty; 5) fraud; 6) negligent misrepresentation; 7) negligence; 8) violation of the Connecticut Unfair Trade Practices Act, ("CUTPA"), CONN. GEN. STAT. §42-110b(a); 9) aiding and abetting conversion and statutory theft; 10) unjust enrichment; 11) money had and received; and 12) constructive trust.

On April 13, 2009 and April 15, 2009, Defendants filed motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons stated herein, Defendants' Motions to Dismiss [Doc. Nos. 45, 48, 58] are **granted**.

## I. BACKGROUND

The following allegations are set forth in the Complaint unless otherwise noted. Westport, Westport B&T and PSCCSI established a collective investment fund for the purpose of investing with Bernard L. Madoff Investment Securities LLC ("BLMIS"), and worked with BLMIS to find potential investors for the fund.  (Compl. ¶ 31.)  Because the minimum investment amount accepted by BLMIS was quite high, feeder funds and aggregators such as Westport and Westport B&T pooled the investments of numerous individuals, who could only invest smaller amounts, into a collective fund for transmission to BLMIS.  (Id. ¶ 29.)  Thus, Defendants' conduct "allowed Madoff to broaden his scheme to capture smaller investors . . ." (Id. ¶ 31.)

Dr. Levinson and Dr. Layton, the two individuals named as plaintiffs, initially entered

into custodial agreements with Westport B&T with respect to their individual retirement accounts ("IRAs") in the 1990s.  Compl. ¶¶ 10-12.  Defendant Clark, an officer at Westport B&T, handled the accounts and communicated with Plaintiffs and class members about them.

The agreements provided in the following or very similar language:

[Westport B&T] will hold as Custodian the securities, monies and other property which it may receive belonging to the Principal and will:

1. Receive interest, dividends, and income from such property for reinvestment or disbursement as the Principal may direct in writing;

2. Collect the proceeds from securities which may mature or be called, attend to the deposit or exchange of securities and rights of companies in reorganization, make purchases and sales of securities as the Principal may direct;

3. Transmit all funds received from the Principal to Bernard L. Madoff, an investment firm registered under Section 3(39)(B) of the Employee Retirement And Income Securities Act of 1974 (ERISA) for investment under a full discretionary basis. [Westport B&T] is acting solely in a ministerial capacity and assumes no responsibility for the investment performance of Bernard L. Madoff and will not be liable in case of any diminution in assets;

4. Deliver to the Principal or legal representative upon its request in writing at any time any property held under the terms of the Agreement;

5. Render statements of property held annually or upon request; . . .

(TD Banknorth Mot. Ex. A-B).[1]

In 1999, Westport B&T exited the institutional custody business and Westport was

---

[1] Although the custodial agreements have not been included in the Complaint, the Court may consider them on a motion to dismiss because they are integral to the claims alleged. "Even when a document is not incorporated by reference [in the complaint], the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (internal citations and quotations omitted).

designated the successor custodian.  (Compl. ¶ 32.)  When their accounts were transferred,

Plaintiffs entered into new custodial agreements with Westport, which were substantially similar

to their previous agreements with Westport B&T.  The agreements with Westport provided in

relevant part:

- Westport would invest all cash and cash equivalents received from the Principal "in [Westport's] deposit money market account until [Westport] transfers the funds to Bernard L. Madoff Investment Securities ("BLMIS") . . ."

- The Principal "authorize[d] [Westport] to transmit to BLMIS all funds received by [Westport] from the Principal . . ."  Westport would "enter into an agreement with BLMIS under which BLMIS will have full discretionary authority as to the manner in which funds are invested."  The Principal's funds would be aggregated with other funds for transmission to BLMIS, and the omnibus account maintained with BLMIS would be named "Westport National Bank."

- Westport would "follow such reasonable written directions which the Principal may deliver to [Westport] at any time, . . . including to request that BLMIS return assets of the Principal to [Westport] and for [Westport] to remit cash or cash equivalents to the Principal."

- Westport "shall maintain adequate records indicating ownership by the Principal; of investments with BLMIS and held by [Westport] as custodian . . ."

- Westport "shall render at least annually statements reflecting the property held by it as custodian . . ."

- "The custodial services fees of [Westport]. . . shall be an annual charge of .006 of the average assets . . ."

(Westport Mot. Ex. A-C; Compl. ¶ 33.)  The Westport agreements also acknowledged that "the

Principal has entered into an agreement with [PSCCSI] for services to be provided by PSCCSI

with respect to Principal's investments made by BLMIS" and that Westport "is authorized and

directed to coordinate its record keeping with that provided by PSCCSI."  Westport was also

authorized to pay PSCCSI annually based on a formula that included the percentage of the

average assets held by Westport for the Principal and the amount of each transaction effected by BLMIS on behalf of the Principal.  (Westport Mot. Ex. A-C.)[2]

Plaintiffs assert that the compensation scheme described in the custodial agreements created a conflict of interest for Defendants.  As the reported value of the assets held in their omnibus account at BLMIS grew, Defendants earned more and more fees. (Compl. ¶ 33.) Therefore, although Defendants were required to safeguard Plaintiffs' investments, "asking tough questions of Madoff posed the risk that Madoff would terminate the relationship thereby jeopardizing the significant custodial and other fees Defendants were earning."  (Id. ¶ 35.)

Consequently, Defendants ignored several red flags that should have alerted them of the Ponzi scheme.  The detailed statements provided by Madoff to Defendants, which were never sent to Plaintiffs, purported to show the trading activity in the omnibus accounts but in fact contained glaring inconsistencies.  For instance, one account statement provided to Plaintiffs after the Ponzi scheme was revealed reflected that tens of thousands of shares of more than 50 Fortune 300 companies were bought in the month of November, but the confirmation slip provided along with this statement reflected that tens of thousands of shares were sold, not

---

[2]      The custodial agreements also contained numerous disclaimers of Westport's liability, such as:
- "The Principal has chosen BLMIS to receive and to invest the Principal's funds, and has not relied on [Westport] in choosing to give BLMIS full discretionary authority."
- Westport "has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS[.]"
- Westport "is acting solely in a ministerial capacity[.]"
- "[T]he Principal will hold [Westport] harmless from any liability to BLMIS incurred by [Westport] resulting from the performance of investments made on behalf of the Principal pursuant hereto by [Westport] or BLMIS."

(Westport Mem. Ex. A-C.)

bought.  (Id. ¶ 39.)  The trade confirmations also revealed that the trades were purportedly

executed by BLMIS' broker-dealer arm rather than through an independent third party, which

Plaintiffs allege greatly increased the risk of loss.  (Id. ¶ 40.)

On December 12, 2008, the day after Madoff was arrested, Plaintiffs and class members

received a letter from Westport.  The letter acknowledged the "recent allegations involving

Bernie Madoff" and reminded Plaintiffs that, pursuant to their custodial agreements, they could

request return of their assets by delivering the request to Westport.  (Compl. ¶ 42.)  This letter

was the first indication that Plaintiffs' retirement savings might be in jeopardy.  (Id. ¶ 43.)  On

January 16, 2009, Plaintiffs received another letter from Westport enclosing a notice it had

received from the Securities Investor Protection Corporation Trustee setting forth the

requirements for filing claims in bankruptcy court.  (Id. ¶ 44.)  The letter also enclosed a BLMIS

account statement dated November 30, 2008 and BLMIS purchase and sale confirmations for the

Westport National Bank account.  Prior to receiving these materials, Plaintiffs had never received

copies of BLMIS account statements or trade confirmations and "had not understood that the

investments made by Madoff with their funds were being held at all times by Madoff rather than

the Custodians."  (Id.)

On February 13, 2009, Plaintiffs filed this Complaint.  In addition to alleging that

Defendants breached the custodial agreements and their fiduciary duties to Plaintiffs by ignoring

the red flags, Plaintiffs allege that Defendants made a number of misrepresentations as to the

nature of the custodial accounts and the safety of their investments.  (Compl. ¶¶ 55, 89.)  The

custodial agreements falsely stated that Plaintiffs' funds would be transmitted to BLMIS for

short-term trading only but at all other times would be held in Plaintiffs' accounts at Westport

B&T or Westport, misleading Plaintiffs as to the activities to be undertaken by the custodians and PSCCSI to safeguard their retirement funds.  Since Plaintiffs' funds had been transferred to BLMIS, the annual account statements from the custodians and correspondence with PSCCSI misrepresented the balances in Plaintiffs' accounts and the fees owed to Westport B&T, Westport and PSCCSI.  (Id. ¶ 55.)  Furthermore, the annual account statements, which only reflected deposits into the individual custodial accounts and withdrawals made to pay Defendants' fees, did not disclose the securities positions in the omnibus account at BLMIS.  (Id. ¶ 36.)

Additional misrepresentations also reassured Plaintiffs that their investments were safe. Defendants falsely stated that the custodians were audited by Arthur Andersen and Deloitte & Touche to provide Plaintiffs with an additional measure of security.  And, in an October 2008 letter, PSCCSI falsely reassured Plaintiffs that their retirement savings were safe from market turmoil because they had been invested in U.S. Treasuries for the past month.  (Id. ¶¶ 41, 89.) Despite these allegations of fraudulent conduct, Plaintiffs never assert that Defendants acted in concert with Madoff to maintain the Ponzi scheme or otherwise had knowledge of the Ponzi scheme.

## II.  STANDARD OF REVIEW

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof."  Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)).  In ruling on a motion under FED. R. CIV. P. 12(b)(6), the court may consider

only "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).

The district court may dismiss a claim under FED. R. CIV. P. 12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

## III.   DISCUSSION

### A. RICO Counts (Counts I and II)

The Complaint asserts that Defendants, "together with Madoff and BLMIS, formed an association-in-fact for the common and continuing purpose described herein . . . and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the 'Omnibus Investment Account Enterprise')." (Compl. ¶ 46.)  Through the Omnibus Investment Account Enterprise, Defendants established and operated the common investment fund, concealed from Plaintiffs the detailed monthly account statements and trade confirmations received from Madoff, and "[c]oncealed the true nature of the relationship" between Defendants and Madoff.[3]  (Id. ¶ 50.)  In support of the predicate acts of mail fraud and wire fraud, Plaintiffs assert that Defendants engaged in a scheme to defraud or obtain money by means of false pretenses, as evidenced by the false statements contained in the custodial agreements, account statements, and other correspondence with

---

[3]    Since Plaintiffs never allege that Defendants had knowledge of Madoff's Ponzi scheme, it is unclear what "true nature of the relationship" Plaintiffs are referring to.

-8-

Plaintiffs.  (Id. ¶¶ 52-55.)   These misrepresentations and concealments were "made for the purpose of deceiving Plaintiffs and the Class and obtaining their property for Defendants' gain." (Id. ¶ 57.)

Defendants jointly make the following arguments in support of dismissing the RICO counts: 1) the claims are barred because they rely on conduct that is actionable as securities fraud; 2) Plaintiffs lack standing because they were not injured "by reason of" Defendants' acts; 3) Plaintiffs have not pled the predicate acts of mail fraud and wire fraud with particularity; 4) Plaintiffs have not adequately alleged a continuing enterprise; and 5) Plaintiffs have not adequately alleged a conspiracy under 18 U.S.C. § 1962(d).

The Court first considers whether the RICO claims are barred because they rely on conduct that is actionable as securities fraud.  The Private Securities Litigation Reform Act, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amendments to 15 U.S.C. §§ 78-78 and 18 U.S.C. § 1964) ("PSLRA"), amended RICO by narrowing the types of conduct that could qualify as a predicate act.  Section 107 of the PSLRA, the "RICO Amendment," states in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therfor in any appropriate United States District Court . . . *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.*

18 U.S.C. § 1964(c) (emphasis added).

> The Conference Committee Report for § 107 makes clear that the RICO Amendment was intended by Congress to 'eliminate securities fraud as a predicate offense in a civil RICO action' and to bar a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 281 (S.D.N.Y. 2009) (internal citations omitted).

Under Section 10(b) of the Securities Exchange Act of 1934, the determination of whether conduct is actionable as securities fraud focuses on whether the fraudulent conduct is "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b).  The Supreme Court has defined the scope of "in connection with" very broadly to encompass a "fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide." S.E.C. v. Zandford, 535 U.S. 813, 825 (2002); see also Ling v. Deutsche Bank, AG, No. 04 CV 4566(HB), 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005) ("[T]he requirement is satisfied when the securities transactions and breaches complained of coincide and are not independent events.").

Defendants argue that the RICO claims are barred because they rely on Madoff's securities fraud to establish their liability.  See e.g., Compl. ¶ 5 (describing Plaintiffs as "the perfect 'mark' for the Ponzi scheme" because "[i]ndividuals [sic] saving for retirement supplied a steady stream of funds for Madoff each year and, by law, these funds could not be withdrawn until retirement without paying significant penalties" and "the steady if unremarkable returns reported to Plaintiffs and Class Members by Defendants, who were paid substantial fees for their 'services' thereby reducing the reported yield on the custodial accounts, misled Plaintiffs and Class Members to believe that their funds were safe and conservatively invested"); id. ¶ 31 ("Plaintiffs and the other Class members' retirement savings would not have been 'invested' with Madoff absent Defendants' creation and decades-long operation of a collective investment fund for the purpose of investing with Madoff.").  Indeed, the conduct actionable as securities fraud need not have been committed by Defendants for the amendment to apply.

> The statute does not say 'no person may rely on a defendant's conduct actionable as securities fraud to establish a RICO violation against the defendant.' Rather, it is written broadly to bar reliance on any conduct, no matter whose conduct it is.

Fezzani v. Bear Stearns & Co., No. 99CIV0793RCC, 2005 WL 500377, at *4 (S.D.N.Y. Mar. 2, 2005) (denying leave to amend defective complaint because the proposed amendments, which relied on a third party's securities fraud to establish defendants' liability under RICO, were still barred by the RICO Amendment).

While Madoff's Ponzi scheme is the principal cause of Plaintiffs' losses and is therefore central to this action, Plaintiffs do not rely on Madoff's Ponzi scheme to establish Defendants' liability. Rather, Plaintiffs allege a different fraudulent scheme between Defendants and BLMIS, in which Defendants induced Plaintiffs to invest in the common investment fund by making false representations in the custodial agreements, account statements and other correspondence for the purpose of collecting fees. Thus, the Court must determine whether Defendants' *own* misrepresentations concerning the safety of Plaintiffs' investments are in connection with the purchase or sale of securities.[4]

In determining whether misrepresentations coincided with the purchase or sale of

----

[4]        Defendants also rely heavily on Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321(3d Cir. 1999), in which the Third Circuit held that investors' RICO claims against their custodians based on a Ponzi scheme run by an investment firm were barred by the RICO Amendment. In that case, however, the plaintiffs alleged that the custodians violated RICO by *knowingly* participating in and furthering the Ponzi scheme through numerous acts of mail, wire and bank fraud, such as preparing false trust statements to conceal the scheme and failing to maintain adequate collateral. Id. at 326. Here, by contrast, the motive of Defendants' allegedly fraudulent conduct was not to perpetuate a Ponzi scheme but to continue to reap the benefits of the fees from Plaintiffs' investments with Madoff. Thus, the Court must consider whether, despite Defendants' lack of knowledge of Madoff's Ponzi scheme, their misrepresentations concerning Plaintiffs' investments involved securities fraud.

securities, courts consider the allegedly fraudulent scheme as a whole.  For instance, in Stechler v. Sidley, Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580 (S.D.N.Y. 2005), investors alleged that several legal and financial services firms conspired to market, sell and implement a tax shelter, which they knew or should have known would be considered unlawful by the IRS.  One part of the tax shelter strategy required investors to acquire and sell common stock.  In response to Plaintiffs' arguments that the connection between the common stock transactions and the alleged fraud was tenuous, the court held that the strategy as a whole, not the individual steps required to carry it out, must be analyzed.  Since the tax strategy involved the purchase and sale of securities, the RICO claims were barred.  Id. at 597-98.  See also Bald Eagle Area Sch. Dist., 189 F.3d at 330 (plaintiffs' "surgical presentation of the cause of action" could not avoid the determination that the conduct giving rise to the predicate offenses amounted to securities fraud); Ling, 2005 WL 1244689, at *4 ("If one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar.  Because here the Plaintiffs contend the wrongful acts were committed as part of a single fraudulent scheme, all of the components must be considered together for securities fraud purposes." ); Seippel v. Jenkens & Gilchrist, P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (Plaintiff's RICO claims based on Defendants' allegedly fraudulent tax shelter, which was supposed to reduce plaintiff's tax liability when exercising his stock options, were barred because the "sale of [plaintiff's] stock was an integral part of the scheme").

In this case, an integral part of the fraudulent scheme was the purchase and sale of securities.  While Plaintiffs steer clear of mentioning the word securities in most of their allegations, the omnibus account created by Defendants was clearly for the purpose of allowing

Madoff to purchase and sell securities using Plaintiffs' funds. And, as Plaintiffs readily acknowledge in their Complaint, but for their custodial agreements with Westport B&T and Westport, which authorized the custodians to bundle Plaintiffs' funds and transmit them to BLMIS for investment at BLMIS' discretion, their funds would never have been invested with Madoff.

Moreover, Defendants' alleged misrepresentations and omissions relate to Madoff's purported purchase and sale of securities with Plaintiffs' funds. Defendants essentially induced Plaintiffs to invest their assets in the common investment fund (and induced them to keep their assets there in the long run) based on false reassurances that their assets would be safe. Many of these false reassurances–misrepresentations that Plaintiffs' assets were being "held" by the custodians and were submitted to BLMIS for short-term trading only, nondisclosure of the individual securities positions in the BLMIS omnibus accounts, and false assertions that Plaintiffs' assets were invested in U.S. Securities–relate to Madoff's purchase and sale of securities. Even misrepresentations about Defendants' fees relate to securities transactions because the calculation of Defendant PSCCSI's fees was determined in part by how many trades Madoff made with Plaintiff's funds.[5]

The Court finds that Plaintiffs' RICO claims are barred by the RICO Amendment because

---

[5]    The cases cited by Plaintiffs are not to the contrary. (See Pls.' Opp. Mem at 11.) Plaintiffs cite OSRecovery, Inc. v. One Groupe Int'l, Inc., 354 F.Supp.2d 357 (S.D.N.Y. 2005) and Renner v. Chase Manhattan Bank, No. 98-926, 1999 WL 47239, at*6-*7 (S.D.N.Y. Feb. 3, 1999), cases where the defendants were not alleged to have made a misleading statement or misrepresentation to the plaintiffs. Since the claims against them amounted to aiding and abetting another parties' fraud, they were not actionable under the federal securities laws; thus the RICO claims were not barred. Here, however, Defendants are alleged to have made numerous false statements to Plaintiffs, not merely aided Madoff in his commission of false statements, so the claims against Defendants are actionable as securities fraud.

they rely on conduct that is actionable as securities fraud.  Therefore, the Court declines to address Defendants' remaining arguments in support of dismissal of the RICO claims.  For the reasons stated above, Defendants' motions to dismiss Counts I and II are **granted**.

*B. State Law Claims* (*Counts III - XII*)

Defendants also assert a number of bases for dismissing the ten state law claims, one of which is that the claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. §§ 77p(b), 78bb(f).  In response to perceived abuses of the class action device in litigation involving nationally traded securities, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z-1; 78u-4.  Among other reforms, PSLRA imposes heightened pleading requirements and authorizes a stay of discovery pending the resolution of a motion to dismiss in securities fraud cases.  The enactment of PSLRA, however, had the unintended consequence of encouraging plaintiffs to bring class actions involving securities fraud under state law to circumvent PSLRA's stringent requirements.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 82 (2006).  In response, Congress enacted SLUSA to prevent plaintiffs from evading the protections against abusive securities litigation codified in PSLRA.  SLUSA provides:

> No covered class action based upon the statutory common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-
>
> (A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

-14-

Thus, the five requirements for SLUSA preemption are: 1) a covered class action 2) based on state law 3) alleging untrue statements or omissions of material fact 4) in connection with the purchase or sale of 5) a covered security.

Plaintiffs do not dispute that this lawsuit is a "covered class action"[6] based on state law (with the exception of the two RICO claims addressed *supra*) or that Madoff purported to trade in covered securities.[7]  They do, however, dispute that the Complaint involves a misrepresentation or omission of a material fact and that the required misrepresentation or omission was in connection with the purchase or sale of securities.  The Court addresses the "misrepresentation or omission" and "in connection with" requirements to SLUSA preemption below.

*(I) "In Connection With"*

Defendants allege that, since the Complaint focuses on Madoff's Ponzi scheme and Defendants' aiding and abetting of that scheme, the allegations are clearly in connection with the purchase or sale of securities.  The Supreme Court has defined "in connection with" very broadly to encompass circumstances where "the scheme to defraud and the sale of securities coincide." S.E.C. v. Zanford, 535 U.S. 813, 822 (2002).  In Dabit, 547 U.S. at 85, the Supreme Court applied this definition of "in connection with" to SLUSA, holding that "it is enough that the

_____

[6]     A covered class action is a lawsuit in which damages are sought on behalf of more than 50 prospective class members and common questions of law or fact predominate over questions affecting only individual members of the class.  15 U.S.C. § 78bb(f)(5)(B)(i)(I).

[7]     A covered security is a security "listed, or authorized for listing, on the New York Stock Exchange or the American Stock Exchange, or listed, or authorized for listing, on the National Market System of the NASDAQ Stock Market (or any successor to such entities)." 15 U.S.C. § 77r(b)(1)(A).

fraud alleged 'coincide' with a securities transaction-whether by the plaintiff or by someone else."  The Court also instructed that SLUSA be read with the "presumption that Congress envisioned a broad construction" of the statute so that the most troublesome class actions would be subject to the PSLRA.  Id. at 86.

Despite the broad application of "in connection with" espoused by the Supreme Court, this Court finds the question of whether Defendants' misrepresentations were "in connection with" the purchase or sale of securities to be more difficult than Defendants suggest.  While there is no question that Madoff's Ponzi scheme was "in connection with" the purchase and sale of securities, Defendants are not alleged to have been knowing participants in that scheme.  The relevant inquiry is whether Defendants' own misrepresentations that unintentionally facilitated Madoff's fraud coincided with the purchase and sale of securities.

Plaintiffs argue correctly that "the alleged misconduct of the defendant is central in determining whether SLUSA is applicable." (Pls.' Supp. Opp. Mem. at 3.)   According to Plaintiffs, Defendants' alleged misrepresentations–contracts that falsely represented that the custodians would hold Plaintiffs' investments and annual account statements that falsely represented the balances in Plaintiffs' accounts–did not coincide with Madoff's securities transactions.  Rather, they concern whether Defendants were "holding Plaintiffs' investments and the alleged value of Plaintiffs' accounts at year end *after the alleged securities transactions had occurred*."  Id. at 3 (emphasis in original).  Moreover, the contracts and annual account statements did not mention any specific securities, make representations about expected returns, or otherwise offer investment advice.  Id. at 11-12.   Instead, the annual account statements "recorded such mundane events as deposits into and withdrawals from Plaintiffs' custodial

accounts, and were provided to Plaintiffs well after the securities transactions that BLMIS purportedly engaged in took place." Id. at 11.

Despite Plaintiffs' arguments to the contrary, the alleged misrepresentations are not required to contain specific securities information or investment advice in order to coincide with securities transactions.  In Fisher v. Kanas, 288 F. App'x 721, 723 (2d Cir. 2008), the Second Circuit affirmed a lower court's holding that proxy statements that misrepresented executive compensation policies were in connection with the purchase or sale of securities because they allegedly deprived shareholders of their full equity in the corporation.  Thus, the plaintiff's breach of fiduciary duty claim was preempted by SLUSA.  Id.  See also Sofonia v. Principal Life Ins. Co., 465 F.3d 873, 877 (8th Cir. 2006) (misrepresentations in a Policyholder Information Booklet, which were intended to induce policyholders to approve insurance company's demutualization process, involved the purchase or sale of securities).

Moreover, Plaintiffs' argument that Defendants' misrepresentations only concern the post-transaction value of their assets is belied by the allegations in the Complaint.  The Complaint alleges that Defendants and BLMIS engaged in a scheme to operate a common investment fund, and that Defendants induced Plaintiffs into investing their assets in the fund by misrepresenting the extent to which Defendants would safeguard their assets.  Thus, some of the misrepresentations occurred prior to–and were necessary conditions for–Madoff's purported purchase and sale of securities with Plaintiffs' funds.

Misrepresentations that induce an investment of funds to the investor's detriment are often sufficient to meet the "in connection with" requirement.  In Gray v. Seaboard Sec. Inc., 126 F. App'x 14, 16 (2d Cir. 2005), the plaintiffs argued that their common law fraud claim was not

preempted by SLUSA because the defendant brokerage firm's misrepresentations about its affiliation with another brokerage firm only induced them to open accounts with the defendant, not purchase or sell specific securities.  The Second Circuit disagreed, holding that the "in connection with" requirement was met because the misrepresentations caused plaintiffs to pay premium brokerage commissions, which accrued upon the purchase or sale of securities.  Id. See also Professional Mgmt. Assocs., Inc. v. Employees' Profit Sharing Plan, 335 F.3d 800, 803 (8th Cir. 2004) ("[M]isconduct [that] caused a plaintiff to invest in inappropriate securities is a claim in connection with the purchase or sale of a covered security for purposes of SLUSA preemption.").

Similarly, in Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340 (11th Cir. 2008), an investor sued Merrill Lynch for allowing the investor's pension fund–which stole the investor's funds rather than investing them–to falsely hold itself out as Merrill Lynch's agent and for failing to prevent the misappropriation of funds.  The Eleventh Circuit found that the misrepresentations were in connection with the purchase or sale of securities because they facilitated the post-investment theft of plaintiff's funds.  Because the complaint essentially alleged that Merrill Lynch fraudulently induced the plaintiff to invest with the pension fund, the claims were preempted by SLUSA.  Id. at 1349-50.  In Cordova v. Lehman Bros., Inc., 413 F. Supp. 2d 1309 (S.D. Fla. 2006), another case stemming from the same pension fund fraud as Instituto de Prevision Militar, the investors alleged that they agreed to invest with the fraudulent pension fund because major financial institutions agreed to serve as custodians and/or trustees of their funds.  Id. at 1311-12.   The investors alleged that the major financial institutions rendered substantial assistance to the fraud by, inter alia, allowing their names, logos, and reputations to

-18-

be used in the pension fund's marketing materials, failing to alert investors of false statements made by the pension fund, and falsely reassuring the investors of the safety of their investments. The court rejected the investors' argument that their state law claims were not in connection with the purchase or sale of securities because they were based solely on the post-investment retention of their retirement trusts.  The "in connection with" requirement was met because the "allegations make clear that Plaintiffs were fraudulently *induced to purchase* the trusts/securities [from the pension fund] based on allegedly false assurances that their funds would be protected by Defendants."  Id. at 1319-20 (emphasis in original).

Here, as well, the crux of Plaintiffs' allegations is that Defendants' fraudulent statements caused Plaintiffs to make poor investment decisions.  Defendants' misrepresentations regarding the safety of Plaintiffs' investments induced Plaintiffs to chose Defendants as their investment advisor and the custodian of their funds, to authorize Defendants to invest their funds with Madoff, and to continue this arrangement until Madoff's fraud was uncovered.

Courts also consider the nature of the parties' relationship, and whether it necessarily involved the purchase and sale of securities, in determining whether the "in connection with" requirement is met.  Rowinski v. Salomon Smith Barney, Inc., 398 F.3d 294, 302 (3d Cir. 2005). For instance, in Dommert v. Raymond James Fin. Serv., Inc., No. CIV A. 1:06-CV-102, 2007 WL 1018234 (E.D. Tex. Mar. 29, 2007), the court held that investors' breach of contract and breach of fiduciary duty claims based on a financial investment services firm's nondisclosure of material information about the terms of its investment agreements were preempted by SLUSA. Since the purpose of the investment agreements was to "utilize [the plaintiff's] assets and expand upon those assets, presumably with the purchase and sale of securities," the court held that the

"in connection with" requirement was met.  Id. at *11.  Moreover, the investment agreement "was formed and the fiduciary relationship was created because Plaintiff contracted with Defendant for the management of her assets, which encompassed the purchase and sale of stock." Id.

Here, as well, the relationship between Plaintiffs and their custodians, as delineated in the custodial agreements, was formed for the purpose of investing Plaintiffs' funds in securities. Both the Westport B&T and Westport agreements authorized the custodians to transmit Plaintiffs' funds to BLMIS for investment on a discretionary basis.  The Westport B&T agreement also expressly authorized the custodian to "make purchases and sales of securities as the Principal may direct . . ."  And, as Plaintiffs acknowledge several times in their Complaint, their funds would never have been invested with Madoff but for their custodial relationship with Westport B&T and Westport and their investment advisor relationship with PSCCSI.

Moreover, a close reading of the Complaint reveals that the nature and purpose of the allegedly fraudulent scheme is connected to the purchase and sale of securities.  The purpose of Defendants' scheme was "to create and operate a common investment fund for the purpose of investing with Madoff and BLMIS and to induce Plaintiffs and Class members to invest their retirement savings in this common fund."  (Compl. ¶ 18.)  Each of the misrepresentations in support of the scheme relates either to the safety of Plaintiffs' funds and conservativeness of the investments or the fees charged to Defendants for their services which, for PSCCSI, depended in part on the amount of each trade effected by BLMIS.  See Broadhead Ltd. Partnership v. Goldman, Sachs & Co., No. 2:06CV009, 2007 WL 951623, at *5 (E.D. Tex. Mar. 26, 2007) (state law claims based on financial services firm's failure to disclose fees associated with bond

purchases and sales in its advisory service agreements were in connection with the purchase or sale of securities).

In support of their argument that Defendants' acts are too far removed from securities transactions to be preempted by SLUSA, Plaintiffs cite cases that preceded the Supreme Court decision in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006).[8]  However, as many courts have acknowledged, the Dabit decision greatly expanded the scope of SLUSA. See, e.g., Fisher v. Kanas, 487 F. Supp. 2d 270, 277 (S.D.N.Y. 2007) ("Although the proxy statements [that misrepresented executive compensation policies] did not make a misrepresentation regarding the purchase or sale of a security, the [SLUSA] statute has been interpreted broadly by the Supreme Court in Dabit to include any misrepresentation touching upon the purchase or sale of securities."); Horattas v. Citigroup Financial Markets, Inc., 532 F. Supp. 2d 891, 901 (W.D. Mich. 2007) (holding that state law claims against trustees for failing to safeguard trust funds were barred by SLUSA because "no matter how persuasive [the plaintiff's] arguments might have been a few years ago, they are now undermined by the broad reading of 'in connection with' announced by the Supreme Court in Dabit"); Dommert, 2007 WL 1018234, at *9-*10 (noting that the plaintiff's reliance on Norman v. Salomon Smith Barney Inc., 350 F.Supp.2d 382 (S.D.N.Y. 2004), was not persuasive in part because the case preceded Dabit).

Given the nature of the allegations in the Complaint, the relationship between the parties, and the broad application of SLUSA espoused by the Supreme Court in Dabit, the Court finds

---

[8]  Plaintiffs cite McPhatter v. Sweitzer, No. Civ. 103CV00170, 2003 WL 22113455 (M.D.N.C. Sept. 8, 2003); Adaba v. Charles Schwab & Co., 127 F. Supp. 2d 1103 (S.D. Cal. 2000); French v. First Union Sec. Inc., 209 F. Supp. 2d 818 (M.D. Tenn. 2002); and Norman v. Salomon Smith Barney Inc., 350 F. Supp. 2d 382 (S.D.N.Y. 2004).

that the allegations against Defendants are in connection with the purchase or sale of securities.

*(II) Misrepresentation or Omission*

In determining whether each claim alleges a misrepresentation or omission, the Court must determine whether the individual claim depends on allegations of fraud. "Under SLUSA, regardless of the words used by a plaintiff in framing her allegations and regardless of the labels she pastes on each cause of action, a court must determine whether fraud is a *necessary component* of the claim. Under this test, a complaint is preempted under SLUSA when it asserts (1) an explicit claim of fraud or misrepresentation (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.'" Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F. Supp. 2d 258, 261 (S.D.N.Y. 2004) (emphasis in original). A claim sounds in fraud when "although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." Id. at 269.

According to this test, Plaintiffs' claims of common law fraud, negligent misrepresentation, and aiding and abetting conversion and statutory theft are preempted by SLUSA because a misrepresentation or other fraudulent conduct is a necessary element of these causes of action. The more difficult question is whether Plaintiffs' non-fraud-based causes of action are preempted as well because they "sound in fraud," *i.e.*, they rely on allegations of fraud as the basis for their claims of breach of contract, breach of fiduciary duty, etc. For instance, in Felton v. Morgan Stanley Dean Witter, 429 F. Supp. 2d 684 (S.D.N.Y. 2006), the court held that investors' breach of contract action against their broker for failing to disclose conflicts of interest was preempted by SLUSA.

> Plaintiffs describe this conduct as a breach [of contract] . . . and so it may have been, but it is also a quintessential example of a fraudulent omission of a material fact under the federal securities laws. . . .   To regard the Amended Complaint as alleging nothing more than common law breaches of contract would reward artful pleading that the law does not permit.

Id. at 693.  See also Dacey v. Morgan Stanley Dean Witter & Co., 263 F. Supp. 2d 706, 710 (S.D.N.Y. 2003) (holding that breach of contract claim was preempted by SLUSA because the defendants' alleged scheme to induce individuals to buy or hold securities by issuing artificially positive ratings on the stock of certain companies clearly concerned misrepresentations or omissions).

In their breach of contract and breach of fiduciary duty counts, Plaintiffs allege that Defendants failed to safeguard Plaintiffs' assets by not maintaining possession of Plaintiffs' funds, neglecting to independently verify the investment returns reported by BLMIS, and ignoring evidence of Madoff's Ponzi scheme.  While none of these allegations sound in fraud, the Complaint states elsewhere that Defendants *intended* to misrepresent their obligations in the Custodial Agreements to induce Plaintiffs to enter into the agreements.  (Compl. ¶ 55(a)).  "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.  It does not become fraud unless, when the promise is made, the defendant secretly intended not to perform or knew that he could not perform."  Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)).  Defendants' intent not to perform turns a simple breach of contract into allegations of fraud.

Moreover, the non-fraud-based causes of action incorporate by reference all preceding allegations in the Complaint, such as the allegations of misrepresentations in the custodial

agreements and annual account statements.  Courts have held that non-fraud-based claims are preempted by SLUSA if they incorporate by reference allegations of false or misleading statements.  The "counts which alleged fraud or misrepresentation . . . taint[] subsequent counts in the complaint."  Breakaway Solutions, Inc. v. Morgan Stanley & Co., No. Civ. A. 19522, 2004 WL 1949300 (Del. Ch. Aug. 27, 2004).  See, e.g., Miller v. Nationwide Life Ins. Co., 391 F.3d 698, 702 (5th Cir. 2004) (holding that breach of contract claim, which incorporated by reference allegations of materially false and misleading statements in seller's prospectus, was preempted by SLUSA); In re Mutual Funds Investment Litig., 384 F. Supp. 2d 845, 871-72 (D.Md. 2005) (dismissing state law counts because they incorporated by reference allegations of fraud made in support of other claims); Professional Mgmt. Assocs., Inc., 335 F.3d at 803 (dismissing negligence claim because, although it contained no allegations of a misrepresentation or omission, it incorporated by reference the misrepresentation allegations made elsewhere in the complaint).  Therefore, the non-fraud-based claims rely on fraud as an integral part of the conduct giving rise to the claims.

Since all of the state law claims allege a misrepresentation or omission in connection with the purchase or sale of securities, the Court finds that they are preempted by SLUSA.  Thus, Defendants' motions to dismiss the state law claims are **granted**.

## C. Leave to Replead

Plaintiffs have requested leave to replead their state law claims in the event that this Court finds that they are preempted by SLUSA.  The Court finds that Plaintiffs' non-fraud-based claims for breach of contract, breach of fiduciary duty, negligence, violation of CUTPA, unjust enrichment, money had and received, and unjust enrichment may be pled without reference to a

misrepresentation or fraudulent scheme to avoid SLUSA preemption.  See, e.g., Beckett v.
Mellon Inv. Serv., LLC, No. 06-36044, 2009 WL 1336735, at *2 (9th Cir. May 14, 2009)
(granting leave to amend complaint that alleged breach of contract, breach of fiduciary duty,
unjust enrichment, and violation of Washington's consumer protection and unfair trade practices
law because plaintiff could conceivably allege these claims in a way that would avoid SLUSA
preemption); In re Mutual Funds Investment Litig., 384 F. Supp. 2d at 871-72 (dismissing state
law counts but granting leave to file an amended complaint without reference to any allegations
of a misrepresentation or fraudulent scheme).  Thus, Plaintiffs' request to replead is **granted**.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss [Doc. Nos. 45, 48, 58] are
hereby **granted**.  Plaintiffs' request to replead is **granted**.

SO ORDERED.

Dated at New Haven, Connecticut, this  22nd  day of December, 2009.


_____/s/_____

Peter C. Dorsey, U.S. District Judge
United States District Court