# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEPHEN R. LEVINSON; RICHARD E.    :
LAYTON; and DR. R. LAYTON PA 401(K)  :
PLAN,               :
     Plaintiffs,       :  Case No. 3:09-CV-00269 (PCD)
                :
     v.          :
                :
PSCC SERVICES, INC.; WESTPORT   :
NATIONAL BANK; TD BANKNORTH NA; :
DENNIS P. CLARK; and ROBERT L.   :
SILVERMAN,         :
                :
     Defendants.      :

## RULING ON DEFENDANTS' MOTIONS TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS

This action arises out of the Ponzi scheme perpetrated by Bernard Madoff. Two individuals and a pension and profit-sharing plan (collectively "Plaintiffs") have brought a first amended class action complaint against Westport National Bank ("WNB") and TD Banknorth NA ("TD Banknorth"), the custodians of their retirement accounts; and Robert L. Silverman ("Silverman"), the president of PSCC Services, Inc. ("PSCCSI"), Plaintiffs' pension consulting and actuarial firm. Plaintiffs and the class they seek to represent maintained custodial accounts with WNB and Westport Bank & Trust ("WBT") (TD Banknorth's predecessor) for their retirement funds. WNB and WBT invested Plaintiffs' assets with Bernard L. Madoff Investment Services ("BLMIS"). After Bernard Madoff admitted his fraud and Plaintiffs realized that their retirement savings were lost, they commenced this class action.

Plaintiffs' original complaint, which was filed on February 13, 2009, asserted causes of

action under the Rackeeter Influenced and Corrupt Organizations Act ("RICO") and state law, including common law fraud, breach of contract, and breach of fiduciary duty. On December 23, 2009, this Court dismissed the complaint for failure to state a claim. The Court found that the RICO claims were barred because they relied on conduct that is actionable as securities fraud and the state law claims were preempted by the Securities Litigation Uniform Standards Act ("SLUSA") because they alleged a misrepresentation or omission in connection with the purchase or sale of a covered security. The Court granted Plaintiffs leave to replead their state law claims to avoid SLUSA preemption.

On January 19, 2010, Plaintiffs filed the first amended class action complaint ("Amended Complaint"), which contains causes of action for breach of contract, breach of fiduciary duty, negligence, violation of the Connecticut Unfair Trade Practices Act, unjust enrichment, money had and received, and constructive trust. The crux of Plaintiffs' allegations is that Defendants breached their custodial agreements or their fiduciary duties by, *inter alia*, allowing BLMIS to maintain possession of Plaintiffs' assets at all times and by ignoring evidence of Madoff's Ponzi scheme.

On March 13, 2009, TD Banknorth and Silverman moved to dismiss the complaint [Doc Nos. 193, 196]. On July 7, 2010, WNB moved for judgment on the pleadings [Doc. No. 231]. For the reasons stated herein, TD Banknorth's motion to dismiss is **granted,** Silverman's motion to dismiss is **granted in part and denied in part**, and WNB's motion for judgment on the pleadings is **granted in part and denied in part**.

## I. BACKGROUND

The following allegations are set forth in the Amended Complaint unless otherwise noted.

Beginning in September 1986, Plaintiffs and putative class members (collectively "account holders") entered into custodial agreements with WBT, which set forth the terms for the establishment and maintenance of custodial accounts with WBT. (Am. Compl. ¶ 27.) The custodial agreements provided in pertinent part: (1) WBT would act as custodian with respect to all cash, cash equivalents, securities and other property transmitted by account holders; (2) account holders' funds would be deposited into custodial accounts at WBT and then transferred to an omnibus account in WBT's name at BLMIS for investment; (3) WBT would receive and maintain adequate records of ownership by Plaintiffs and other account holders of investments with BLMIS; (4) WBT would provide statements to Plaintiffs and other account holders at least annually reflecting the property held by WBT as custodian; (5) Plaintiffs and other account holders would pay an annual custodial fee to WBT based on the average assets held by WBT; and (6) Plaintiffs and other account holders would pay PSCCSI an annual fee for its services based on the average assets held by WBT plus a fee for each transaction effected by BLMIS in the omnibus account. (Id. ¶ 28.) In July 1999, WNB assumed the role of custodian of Plaintiffs' accounts. Plaintiffs entered into new custodial agreements with WNB, which were nearly identical to the previous agreements with WBT. (Id. ¶ 27.)

BLMIS provided WBT and its successor WNB (collectively "the custodians") with trade confirmations and a monthly statement reflecting all transactions that it allegedly engaged in with the funds in the omnibus account. The custodians were responsible for reviewing and maintaining this documentation, which the account holders never received. (Id. ¶ 34.) Pursuant to the custodial agreements, the custodians provided each account holder with an annual account statement reporting the account holder's total account balance, as well as any deposits or

withdrawals by the account holder, and all custodial, record-keeping, and administrative fees paid to the custodian and PSCCSI. Each account holder also received an annual letter from PSCCSI signed by Silverman reporting the same total account balance as that reported in the custodians' annual account statements. (Id. ¶ 35.) The values reflected in the annual account statements were determined by adding the year end balance reported by BLMIS in the omnibus account to the year end balance in the custodians' demand deposit account ("DDA") or money market account ("MMA") (which is where the remainder of account holders' funds were held), and assigning each account holder his pro rata share of the total. (Id. ¶ 36.)

Plaintiffs assert that the custodians breached their contractual duties and the custodians and Silverman breached their fiduciary duties to the account holders in a number of ways. First, according to Plaintiffs, the custodial agreements obligated the custodians to hold the account holders' funds in individual accounts maintained at the custodians' banks, and only transfer the funds to BLMIS on a short-term basis for trading purposes. (Id. ¶ 48(b), 63.) The custodians, however, never kept Plaintiffs' funds in individual accounts but rather transferred all account holders' funds to a single DDA or MMA account. Some of the account holders' funds were kept permanently in the DDA or MMA account and were used to pay the custodial fees and PSCCSI's record-keeping and administrative fees. (Id. ¶ 32.) The remaining funds were transferred to an omnibus account in the custodians' names at BLMIS for investment. The custodians only requested a return of funds invested in the omnibus account when they received requests for distributions from custodial account holders or if the funds in the DDA or MMA account were not sufficient to pay custodial fees or record-keeping and administrative fees to PSCCSI. (Id. ¶¶ 32-33, 48(a).)

Second, the custodians failed to maintain adequate records of the assets held on behalf of Plaintiffs and other account holders. The custodians did not record custodial and record-keeping fees paid to them and PSCCSI and used incorrect values in their record-keeping. In addition, WNB never verified the price and market value of options listed in the monthly omnibus account statements received by BLMIS to determine the market value for long-term and short-term positions in the account. (Id. ¶ 48(b).) The custodians also allowed PSCCSI to calculate its own fees, thereby failing to discharge their duty to calculate and pay the fees owed to PSCCSI themselves. (Id. ¶ 48(c).)

Third, the custodians and Silverman failed to make inquiries of BLMIS despite numerous red flags contained in the documentation received from BLMIS. (Id. ¶ 38.) The most blatant red flag was the exponential growth in value of the omnibus account as reported by BLMIS. Between 1999 and 2008, WNB withdrew tens of millions of dollars from the omnibus account at BLMIS while depositing less than $2 million, yet the value of omnibus account as reported by BLMIS grew over fifty percent—from $39 million to $60 million—during that time period. (Id. ¶ 39.) Similarly, between 1986 and 1998, WBT deposited $8.9 million in the omnibus account and withdrew $9.3 million, yet BLMIS reported the account's value at $36 million in December 1998. (Id. ¶ 40.)

The monthly account statements sent from BLMIS to the custodians raised other red flags. For example, a December 2003 monthly account statement contained five pages of purported "buys" and "sells" of more than 40 S&P 500 stocks in the exact same quantities and at the exact same prices, which "reflected a pattern of trading that was nothing short of bizarre." (Id. ¶ 42.) Defendants' failure to make inquiries was especially troubling given that BLMIS

acted as both investment manager and broker in connection with trading reflected on the monthly BLMIS account statements. The increased risk of loss associated with an arrangement where one party holds the funds and makes decision as to how the funds will be invested is precisely why Plaintiffs retained a custodian. (Id. ¶ 43.)

The custodians' regulators warned them of their inadequate supervision of the custodial accounts and lack of information concerning the omnibus account at BLMIS. For example, following an examination of WBT, the Federal Deposit Insurance Corporation ("FDIC") issued a report in 1991, which expressed concern that WBT was not exercising reasonable diligence in its role as custodian and maintained no records of the basis for its valuation of the custodial accounts, thereby breaching the custodial agreements and its fiduciary duties. (Id. ¶ 44.) After WNB assumed the custodian role in 1999, the Office of Comptroller of the Currency ("OCC") issued similar criticisms of WBT's operation and administration of the custodial accounts in a series of examination reports between 1999 and 2009. In particular, the OCC expressed concern regarding WBT's inability to obtain more frequent access to information regarding its account at BLMIS. (Id. ¶ 45.) Despite these criticisms, neither custodian changed its procedures for administering and operating the custodial accounts. (Id. ¶ 47.)

Plaintiffs also assert that WBT became aware of serious deficiencies in the management of the custodial accounts yet concealed this information from account holders. In December 1996, HUBCO, Inc. acquired WBT and merged it into Lafayette American Bank & Trust ("Lafayette"), another local Connecticut bank that HUBCO had acquired earlier in the year. The trust operations of WBT and Lafayette were slowly merged with those of HUBCO's subsidiary, Hudson United Bank. (Id. ¶ 49.) Hudson United personnel assigned to oversee the trust

operations of the former WBT, including the custodial accounts, encountered difficulties in administering the accounts in accordance with Hudson United's usual procedures. (Id. ¶ 50.) Michael O'Brien, the head of Hudson United's trust operations, became concerned that the manner in which the custodial accounts were administered might expose Hudson United to liability, and commenced an examination of the custodial accounts. (Id. ¶ 51.) In April 1999, O'Brien informed Silverman that Hudson United intended to resign as custodian of the accounts on June 30, 1999. In May 1999, a Hudson United representative directed BLMIS to liquidate all assets held in the omnibus account and invest the proceeds in U.S. Treasuries by June 30, 1999 to ensure the protection of the account holders. (Id.) Silverman aggressively searched for a new custodian and was turned down by all candidates except WNB. Left with no alternative, Silverman chose WNB as the successor custodian even though it had neither the personnel nor the systems in place to administer or operate the accounts. WNB was designated custodian on July 31, 1999. (Id. ¶ 53.)

On December 12, 2008, the day after Madoff was arrested, Plaintiffs and class members received a letter from WNB. The letter acknowledged the "recent allegations involving Bernard Madoff" and reminded Plaintiffs that, pursuant to their custodial agreements, they could request return of their assets by delivering the request to WNB. (Id. ¶ 54.) This letter was the first indication that Plaintiffs' retirement savings might be in jeopardy. (Id. ¶ 66.) On January 16, 2009, Plaintiffs received another letter from WNB enclosing a notice it had received from the Securities Investor Protection Corporation ("SIPC") Trustee setting forth the requirements for filing claims in bankruptcy court. (Id. ¶ 56.) The letter also enclosed a BLMIS account statement dated November 30, 2008, which purported to identify all securities positions in the

omnibus account as of November 30, 2008, purchase and sale confirmations received by WNB from BLMIS for the account, copies of the annual account statements for the custodial accounts prepared by WNB, and a document purporting to identify each account holder's individual interest in the securities held in the omnibus account. (Id.) Prior to receiving these materials, Plaintiffs had never received copies of BLMIS account statements or trade confirmations and "had not understood that the investments made by Madoff with their funds were being held at all times by Madoff rather than the Custodians." (Id.)

In a highly critical examination report dated January 5, 2009, the Office of the Comptroller of the Currency ("OCC") concluded that WNB's custodial functions were less than satisfactory. The report cited WNB's incorrect calculation of asset values, its use of stale asset values in processing mid-month deposits and withdrawals, and the method used to calculate the fees paid to PSCCSI. The OCC also noted that, because the account at BLMIS was in WNB's name, it was unclear whether SIPC coverage would be provided to the account holders. (Id. ¶ 57.)

On February 13, 2009, Plaintiffs initiated this suit. In addition to alleging that Defendants ignored red flags that should have alerted them to the Ponzi scheme, the original complaint alleged that Defendants committed fraud by making a number of misrepresentations as to the nature of the custodial accounts and the safety of their investments. The original complaint asserted causes of action under the Rackeeter Influenced and Corrupt Organizations Act ("RICO") and state law, including common law fraud, breach of contract, and breach of fiduciary duty. On December 23, 2009, this Court dismissed the complaint for failure to state a claim. The Court found that the RICO claims were barred because they relied on conduct that is

actionable as securities fraud and the state law claims were preempted by the Securities

Litigation Uniform Standards Act ("SLUSA") because they alleged a misrepresentation or

omission in connection with the purchase or sale of a covered security. The Court granted

Plaintiffs leave to replead their state law claims without reference to a misrepresentation or

omission to avoid SLUSA preemption.

Plaintiffs filed their Amended Complaint on January 19, 2010. The Amended Complaint

alleges causes of action for breach of contract, breach of fiduciary duty, negligence, violation of

the Connecticut Unfair Trade Practices Act, unjust enrichment, money had and received, and

constructive trust. As discussed *supra*, the crux of Plaintiffs' allegations is that Defendants

breached their custodial agreements and/or their fiduciary duties by, *inter alia*, allowing BLMIS

to maintain possession of Plaintiffs' assets at all times and by ignoring evidence of Madoff's

Ponzi scheme. TD Banknorth's and Silverman's motions to dismiss and WNB's motion for

judgment on the pleadings are the subjects of the instant ruling.

## II. STANDARD OF REVIEW

### (A) Motion to Dismiss

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)

"is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence

which might be offered in support thereof." Ryder Energy Distrib. Corp. v. Merrill Lynch

Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (quoting Geisler v. Petrocelli, 616 F.2d 636,

639 (2d Cir. 1980)). In ruling on a motion under FED. R. CIV. P. 12(b)(6), the court may consider

only "the facts as asserted within the four corners of the complaint, the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy

v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).

The district court may dismiss a claim under FED. R. CIV. P. 12(b)(6) only if the plaintiff's factual allegations are not sufficient "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

### (B) Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." A motion for judgment on the pleadings is decided on the same standard as a motion to dismiss. Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Thus, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. To survive a Rule 12(c) motion, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Iqbal, 129 S.Ct. at 1949).

### III. DISCUSSION

All Defendants argue that Plaintiffs' claims are barred by SLUSA and that, in any event, the allegations in the Amended Complaint fail to state plausible claims against them. TD Banknorth also argues that the claims against it are time-barred.

### (A) Statute of Limitations

TD Banknorth argues that all claims against it accrued no later than July 31, 1999—the date WBT ceased serving as custodian of Plaintiffs' accounts. Because all of the applicable

statute of limitations are six years or shorter,[1] TD Banknorth seeks to dismiss the claims as time-barred. Plaintiffs do not dispute that their causes of action accrued more than six years prior to the filing of their original complaint on February 13, 2009. They instead argue that the statute of limitations should be tolled because of fraudulent concealment.

A plaintiff "has the burden of pleading facts sufficient to establish that the statutes of limitations should be tolled." OBG Tech Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp., 503 F. Supp. 2d 490, 504 (D. Conn. 2007). In order to toll the statute of limitations because of fraudulent concealment, a plaintiff must allege:

> (1) a defendant's actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) [the] defendant's intentional concealment of these facts from the plaintiffs; and (3) [the] defendant's concealment of the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

Bartone v. Robert L. Day Co., 656 A.2d 221, 225 (Conn. 1995). Moreover, plaintiffs "must 'allege with particularity the circumstances' surrounding the alleged fraudulent concealment in accordance with the heightened pleading requirements for fraud that are specified in Rule 9(b)." OBG Tech Srvcs., Inc., 503 F. Supp. 2d at 504 (internal citations omitted).

The Amended Complaint alleges that, when WBT was bought by TD Banknorth's predecessor HUBCO in 1996, WBT's new management realized that WBT's maintenance of its

---

[1] The statute of limitations for the causes of action are as follows: six years for contract, CONN. GEN. STAT. § 52-576(a); three years for tort, CONN. GEN. STAT. § 52-577 (2008); three years for negligence, CONN. GEN. STAT. § 52-584 (2008); and three years for violations of CUTPA, CONN. GEN. STAT. § 42-110g(f). All of the applicable statutes of limitations begin to run when the alleged breach of violation occurred, regardless of when the plaintiff discovered or should have reasonably discovered the breach or violation. See, e.g., Tolbert v. Conn. Gen. Life. Ins. Co.,778 A.2d 1, 5-6 (Conn. 2001) (breach of contract); Certain Underwriters at Lloyd's, London v. Cooperman, 957 A.2d 836, 851 n. 27 (Conn. 2008) (tort); Stein v. Katz, 567 A.2d 1183, 1185 (Conn. 1989) (negligence); Fichera v. Mine Hill Corp., 541 A.2d 472 , 476 (Conn. 1988) (CUTPA).

custodial accounts was seriously flawed and might expose HUBCO to liability. (Id. ¶ 51.) Because of the potential exposure to liability, WBT resigned as custodian without disclosing to the account holders the flaws it had uncovered. The allegations make clear that WBT's successor HUBCO had knowledge of its potential liability for WBT's breach of the custodial agreements, that it did not disclose this information to the account holders, and that it did so to delay or to entirely avoid lawsuits based on this breach. Although fraudulent concealment usually requires an affirmative act of concealment, nondisclosure is sufficient where, as here, the defendant has a fiduciary duty to disclose material facts.[2] Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP, 912 A.2d 1019, 1034 (Conn. 2007).

This Court need not decide whether these allegations adequately plead fraudulent concealment because, even if the statute of limitations were tolled, the Securities Litigation Uniform Standards Act ("SLUSA") bars Plaintiffs' allegations of WBT's fraud. SLUSA provides:

> No covered class action based upon the statutory common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-
>
> (A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or

---

[2]     Defendants dispute that they had fiduciary duties to Plaintiffs. As discussed in detail *infra*, because the custodial relationship can be "characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other," Dunham v. Dunham, 528 A.2d 1123, 1134 (Conn. 1987), the Court finds that Plaintiffs have adequately alleged such a duty.

contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. §§ 77p(b), 78 bb(f). Thus, the five requirements for SLUSA preemption are: (1) a covered class action (2) based on state law (3) alleging untrue statements or omissions of material fact (4) in connection with the purchase or sale of (5) a covered security.

In its opinion dismissing the original complaint, this Court held that the alleged misrepresentations in the custodial agreements—which involved the extent to which the custodians would safeguard Plaintiffs' assets—were in connection with BLMIS' purported purchase and sale of securities for two reasons. First, a primary purpose of the custodial relationship as described in the parties' custodial agreements was to aggregate Plaintiffs' assets with other account holders', transmit the assets to a common investment fund maintained at BLMIS, and authorize BLMIS to purchase and sell securities using assets in the common investment fund. Second, Defendants induced Plaintiffs to enter into the custodial agreements (and to maintain the custodial relationship until Madoff's fraud was uncovered) based on false assurances as to the safety of their assets. In allowing Plaintiffs leave to replead, the Court held that they could possibly avoid SLUSA preemption if they removed all allegations of fraud by Defendants. The amended complaint, however, explicitly asserts that WBT omitted a material fact from the account holders, and thus committed fraud.

Plaintiffs argue that WBT's fraudulent concealment of its breach of its contractual and fiduciary duties was not in connection with the purchase and sale of securities because the concealment did not contribute to the breach. The Court is not persuaded that the omission that forms the basis of the fraudulent concealment tolling is any different from the misrepresentations and omissions alleged in the original complaint that were found to be in connection with the

-13-

purchase or sale of securities. WBT's nondisclosure of its inadequate maintenance of the custodial accounts induced Plaintiffs to keep their custodial arrangement with WBT's successor, WNB, and falsely assured Plaintiffs that their investments were being safeguarded by the custodian. As the Court held in its previous opinion, misrepresentations that induce the investments of funds in securities (or, in this case, induce investors to continue an investment relationship that involves securities transactions) are in connection with the purchase or sale of securities. See also in re Beacon Assocs. Litig., No. 09 Civ. 777(LBS), 2010 WL 3895582, at *34 (S.D.N.Y. Oct. 5, 2010) (holding that misrepresentations concerning the investment strategies of the Beacon Fund, which invested the plaintiffs' assets with Madoff, were "in connection with" the purchase and sale of securities even though the shares of the Beacon Fund were not covered securities because the Fund was created for the purpose of investing in securities and the misrepresentations had the effect of facilitating Madoff's fraud). Therefore, Plaintiffs' claims against TD Banknorth are barred by SLUSA, and TD Banknorth's motion to dismiss is **granted**. Because it is clear that TD Banknorth must allege fraudulent concealment to toll the statute of limitations and that any allegation of fraud is preempted by SLUSA, an amended complaint would be futile.

**(B) Preemption Under SLUSA**

WNB and Silverman argue that SLUSA preempts the claims against them as well even though the Amended Complaint does not allege that they made misrepresentations or omissions to the account holders or engaged in any other type of fraud. First, they argue that whether they engaged in fraud is irrelevant because Madoff's fraud qualifies as a misrepresentation or omission that triggers SLUSA preemption. The plain language of SLUSA, they contend,

-14-

supports their argument because it does not limit preemption to misrepresentations or omissions made by the defendant. See 15 U.S.C. § 78bb(f)(1) ("No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging–(A) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security . . .").

It is true that, by its own terms, SLUSA does not require that the defendant have made the untrue statement or omission upon which the state law claims are based. "Congress' failure to expressly limit SLUSA preemption to misrepresentations or omissions made by the defendant was not an oversight, but an intentional omission" as Congress intended for SLUSA to preempt claims against defendants who intentionally aid and abet a third party's misrepresentations or omissions. LaSala v. Bordier et Cie, 452 F. Supp. 2d 575, 586 (D.N.J. 2006) (holding that claims based on defendant banks' aiding and abetting of a third party's fraud were precluded by SLUSA); rev'd on other grounds, 519 F.3d 121 (3d Cir. 2008). However, "the conduct of [the] defendant is still central to SLUSA analysis and . . . the mere allegation of misrepresentations somewhere in the complaint is not sufficient for SLUSA preemption." LaSala v. UBS, AG, 510 F. Supp. 2d 213, 239 (S.D.N.Y 2007); see also Pension Comm. of the Univ. of Montreal Pension Plan v. Bank of Am. Sec., LLC, No. 05 Civ. 9016 (SAS), 2010 WL 546964, at *2 (S.D.N.Y. Feb. 16, 2010) ("Only the alleged misstatements by the Citco Defendants are relevant for an analysis of SLUSA preemption."). Regardless of whether the defendant or a third party made the misrepresentations, the allegations against the defendant must sound in fraud for SLUSA to apply. LaSala, 510 F. Supp. 2d at 239; see also Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc., 341 F. Supp. 2d 258, 266 (S.D.N.Y. 2004) (holding that "a court must

determine whether the state law claim relies on misstatements or omissions as a 'necessary component'" of the claim). Where, as here, the defendants had no knowledge of the third party's misrepresentations—let alone intentionally aided them—the Court finds that those misrepresentations are not sufficient to trigger SLUSA preemption.

Defendants cite only one case, Barron v. Igolnikov, 09 CIV. 4471 (TPG), 2010 WL 882890 (S.D.N.Y. Mar. 10, 2010), where a third party's misrepresentations or omissions were held sufficient to trigger SLUSA preemption and the defendant was not alleged to have aided and abetted the fraud.[3] Barron involves facts strikingly similar to those in this case and thus warrants a close analysis. The Barron plaintiffs sued a Madoff feeder fund, claiming that the fund breached its fiduciary duty and was grossly negligent in steering their investments to Madoff and in ignoring red flags related to Madoff's investments. Although first noting that SLUSA requires that the "defendant must have misrepresented or omitted a material fact," the court nevertheless held that SLUSA preempted the plaintiffs' claims because Madoff's fraud was a misrepresentation in connection with the purchase or sale of a security. In so holding, the court cited Merrill Lynch, Pierce Fenner & Smith, Inc. v. Dabit, which held that SLUSA applied to claims brought by holders, as well as sellers and buyers, because "the identity of the plaintiffs does not determine whether the complaint alleges fraud 'in connection with the purchase or sale'

---

[3] The other cases cited by Defendants involve instances where the defendants knowingly made or aided misrepresentations that facilitated a third party's fraud. See, e.g., Instituto de Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1345 (11th Cir. 2008) (holding that SLUSA preempted claims against financial services firm that allegedly aided and abetted a pension fund's fraud by allowing the pension fund to misrepresent itself as financial services firm's agent); Horattas v. Citigroup Financial Markets, Inc., 532 F. Supp. 2d 891, 897 (W.D. Mich 2007) (complaint alleged that defendants obtained millions in endowment care funds through fraud and misrepresentation).

of securities." 547 U.S. 71, 89 (2006). Although <u>Dabit</u> held that a plaintiff's role is not crucial to SLUSA analysis, it made no corresponding analysis of the importance of the defendant's role. <u>See</u> <u>LaSala</u>, 510 F. Supp. 2d at 239 (analyzing <u>Dabit</u> and noting that while "plaintiff's identity is not a critical component of SLUSA analysis, defendant's conduct is"). The <u>Barron</u> court also cited this Court's decision in Defendants' first motion to dismiss, <u>Levinson v. PSCC Servs., Inc.</u>, No. 3:09-CV-269 (PCD), 2009 WL 5184363 (D. Conn. Dec. 23, 2009), for the proposition that "SLUSA has precluded state-law claims where defendants placed plaintiffs' retirement proceeds into a collective fund that invested with Madoff and BMIS and subsequently ignored several 'red flags' that should have alerted them to Madoff's Ponzi scheme." <u>Barron</u>, 2010 WL 882890, at *4. But this Court's holding that SLUSA preempted Plaintiffs' claims was based on allegations in the original complaint that Defendants had made a number of misrepresentations as to safety of Plaintiffs' investments, not on the "red flags" that Defendants allegedly ignored. Given the abundance of caselaw holding that the claims against a defendant must sound in fraud for SLUSA to apply, this Court is not persuaded by the analysis in <u>Barron</u>. A third party's fraud—although the intervening and primary cause of the plaintiff's losses—does not supplant the fraudulent conduct on the part of the defendant that is necessary to trigger SLUSA preemption.

WNB and Silverman's second argument in support of SLUSA preemption is that, even if the Amended Complaint does not say so explicitly, it implicitly alleges misrepresentations and omissions by WNB and Silverman. To trigger SLUSA, a complaint must allege either "(1) an explicit claim of fraud or misrepresentation (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that

-17-

'sound in fraud.'" Xpedior Creditor Trust, 341 F. Supp. 2d at 261. Since the Amended Complaint contains no explicit claims of fraud or misrepresentation against WNB and Silverman, the Court must consider whether its claims nevertheless sound in fraud. "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." Id. at 269. Because plaintiffs may seek to avoid SLUSA preemption through artful pleading, courts "must look beyond the face of the complaint to analyze the substance of the allegations made." Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 34 (2d Cir. 2005), vacated on other grounds, 547 U.S. 71. "The question under SLUSA is not whether the complaint uses the prohibited words: 'an untrue statement or omission of a material fact' or a 'manipulative or deceptive device or contrivance.' It is whether the complaint covers the prohibited theories, no matter what the words are used (or disclaimed) in explaining them." Segal v. Fifth Third Bank, N.A., 581 F.3d 305, 311 (6th Cir. 2009).

WNB and Silverman argue that the Amended Complaint implicitly asserts that they made a number of misrepresentations regarding the investment and safety of account holders' assets. According to the Amended Complaint, the custodial agreements required WNB to "hold funds deposited by Plaintiffs and Class Members and/or the assets purchased with them," (Am. Compl. ¶ 32), and to "provide statements to Plaintiffs and Class Members . . . at least annually reflecting the property held." (Am. Compl. ¶ 28(d).) WNB, however, did not hold Plaintiffs' assets but instead transferred them to an omnibus account at BLMIS indefinitely. Because the annual account statements did not state that BLMIS, rather than the custodian, was holding the account holders' funds, WNB and Silverman contend that the account statements contain

misrepresentations or omissions in connection with the purchase or sale of securities. WNB and Silverman also contend that, because Plaintiffs assert that the custodians and Silverman did not adequately safeguard their assets, implicit in these allegations is that Defendants misrepresented the extent to which they would safeguard account holders' assets.

WNB and Silverman read allegations into the Amended Complaint that simply do not exist. This case boils down to different interpretations of the custodians' and Silverman's obligations under the custodial agreements and as alleged fiduciaries. Plaintiffs argue that the custodial agreements and their fiduciary roles obligated Defendants to safeguard their assets, whereas Defendants argue that their roles were entirely ministerial. Plaintiffs also argue the agreements required the custodians to transfer their funds to BLMIS for short-term trading only and, at all other times, to hold their assets in their individual accounts at the custodians' banks. See Am. Compl. ¶ 56 (Plaintiffs "had not understood that the investments made by Madoff with their funds were being held at all times by Madoff rather than the Custodian."). Defendants, on the other hand, argue that the agreements authorized them to aggregate the account holders' funds into one DDA or MMA account, to pay themselves custodial fees and Silverman an advisory fee with these funds, and to transfer the remaining funds to a BLMIS omnibus account for investment by BLMIS until account holders requested remittances. Plaintiffs *do not* assert that the annual account statements contain intentional misrepresentations or omissions from Defendants. To the contrary, they assert that Defendants accurately reported the year-end value of the BLMIS omnibus account as it was reported by BLMIS in the annual account statements. The problem, of course, was that BLMIS was misrepresenting the value of the account to conceal Madoff's Ponzi scheme.

Although plaintiffs cannot escape SLUSA preemption through artful pleading, it is equally true that a "defendant may not recast plaintiff's Complaint as a securities fraud class action so as to have it preempted by SLUSA." Paru v. Mut. of Am. Life Ins. Co., No. 04-civ-6907, 2006 WL 1292828, at *4 (S.D.N.Y. May 11, 2006). Defendants' interpretation of the Amended Complaint would recast every breach of contract or breach of fiduciary claim into allegations of fraud. This Court refuses to hold that the Amended Complaint contains a misrepresentation or omission based on "essentially an assertion that 'you have to assume in any lawsuit there's a disputed truth, and if there's a disputed truth, then there is either an untrue statement or there is an omission of material fact.'" Webster v. N.Y. Life Ins. & Annuity Corp., 386 F. Supp. 2d 438, 441 (S.D.N.Y. 2005) (holding that SLUSA did not preempt breach of contract claim because a party does not commit fraud "by failing to anticipate, discover and disabuse the other [party] of its contrary interpretation of a term in the contract"). Where, as here, a complaint alleges that a defendant's good-faith interpretation of its contractual obligations differs from the plaintiff's, the defendant lacks the intent to deceive that is a requisite of fraud cases.[4]

---

[4] The cases cited by Defendants are not to the contrary as they involve circumstances where the Defendant made intentional misrepresentations or failed to disclose material facts. See e.g., Segal v. Fifth Third Bank, N.A., 581 F.3d 305, 309-10 (6th Cir. 2009) (affirming dismissal of breach of fiduciary duty, breach of contract, and unjust enrichment claims because the complaint alleged, *inter alia*, that the defendant bank failed to inform trust beneficiaries that their trust accounts would be invested in proprietary mutual funds; that the bank carried out a "planned corporate scheme" to lure testators to designate the bank as trustee; that the bank purported to provide planning advice under the guise that it was customized when it was not; that the bank intentionally overcharged its trust clients; and that the bank did not deal ethically and honestly with the class of plaintiffs"); Felton v. Morgan Stanley Dean Witter, Inc., 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006) (dismissing breach of contract claim because the plaintiff's allegations that the defendant securities broker failed to disclose a conflict of interest was "a quintessential example of a fraudulent omission of a material fact under the

WNB and Silverman's third argument is that the Amended Complaint implicitly alleges that WNB used or employed a deceptive device or contrivance in connection with the purchase or sale of a covered security. See 15 U.S.C. § 78bb(f)(1)(B). The custodial accounts, WNB and Silverman contend, are the deceptive devices because the Amended Complaint alleges a discrepancy between the way Plaintiffs thought the accounts were administered and how WNB actually administered them. As discussed *supra*, the fact that Plaintiffs and Defendants interpreted Defendants' obligations to the account holders differently does not necessarily mean that Defendants deceived Plaintiffs.[5] Absent an act of deception on the part of WNB or Silverman—which this Court finds alleged nowhere explicitly or implicitly in the Amended Complaint—the non-fraud based causes of action alleged by Plaintiffs are insufficient to trigger SLUSA preemption.

Because the Court finds that the Amended Complaint does not allege a misrepresentation or omission by Silverman or WNB, Plaintiffs' claims against them are not preempted by SLUSA.

**(C) State Law Claims**

WNB and Silverman also argue that each of the state law claims has not been adequately pled. The Court addresses the legal viability of each claim below.

---

federal securities laws").

[5] WNB also asserts that "Plaintiffs insinuate that WNB and other Defendants failed to share with Plaintiffs information about the administration of their custodial accounts." (WNB. Mem. at 12.) In support of this argument, WNB relies on Plaintiffs' allegations that only the custodians and Silverman were aware of certain information regarding BLMIS' investment of account holders' funds, such as the outflow and inflow of money into the BLMIS omnibus account. But Plaintiffs never allege that the custodians were obligated to share this information with account holders. Rather, Plaintiffs argue that, because of Silverman's and the custodians' access to greater information concerning BLMIS' investment of the account holders' funds, they should have been aware of the "red flags" contained in this information.

**(1) Breach of Contract Against WNB (Count I)**

The Amended Complaint alleges that WNB breached the custodial agreement by: (1) allowing BLMIS to maintain possession of account holders' funds at all times instead of on a short-term basis only; (2) keeping a portion of account holders' funds in a DDA or MMA account for years at a time and not investing those assets in the omnibus account at BLMIS; and 3) failing to maintain adequate records indicating ownership by account holders of the investments with BLMIS.

In response to the first allegation, WNB argues that the unambiguous contract language allowed it to transfer Plaintiffs' funds to BLMIS for investment until Plaintiffs requested remittances. "[T]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face." Tallmadge Bros., Inc. v. Iroquois Gas Transmission System, L.P., 746 A.2d 1277, 1287 (Conn. 2000) (quoting 11 S. Williston, Contracts § 30.6 (4th ed. 1999)). "Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." Levine v. Advest, Inc., 714 A.2d 649, 657 (Conn. 1998) (internal citations and quotations omitted). The WNB custodial agreement, which WNB has included with its motion for judgment on the pleadings,[6] provides in relevant part:

---

[6]  Although the custodial agreements have not been included with the Amended Complaint, the Court may consider them on a motion to dismiss because they are integral to the claims alleged. "Even when a document is not incorporated by reference [in the complaint], the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (internal citations and quotations omitted).

1. It is the Principal's intent to transfer cash or cash equivalents to the Bank.[7] The Bank shall accept such property from the Principal and the Bank shall invest all such cash and cash equivalents held hereunder, and any interest, dividend or other income earned from property held by the Bank hereunder, in the Bank's deposit money market account until the Bank transfers the funds to Bernard L. Madoff Investment Services ("BLMIS"), as contemplated in Paragraph 2 hereof.

2. The Principal hereby authorizes the Bank to transmit to BLMIS all funds received by the Bank from the Principal to the extent that the transmission of such funds is practical and acceptable to BLMIS. The Bank is hereby authorized and directed, in its capacity as a custodian hereunder for the benefit of the Principal, to enter into an agreement with BLMIS under which BLMIS will have full discretionary authority as to manner in which funds are invested. The Principal has chosen BLMIS to receive and to invest the Principal's funds, and has not relied on the Bank in choosing to give BLMIS full discretionary authority. It is understood and acknowledged that funds to the Principal which are transmitted to BLMIS will be transmitted together with funds of other persons or entities for whom the Bank is acting in a similar capacity; that the investment account of BLMIS will be under the name "Westport National Bank"; that the funds of the Principal transmitted to BLMIS will be grouped with funds of other persons or entities for investment with BLMIS; that the Bank has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS; that the Bank is acting solely in a ministerial capacity; that the Bank assumes no responsibility for the investment performance of BLMIS; and that the Principal will hold the Bank harmless from any liability to BLMIS incurred by the Bank resulting from the performance of investments made on behalf of the Principal pursuant hereto by the Bank or BLMIS.

3. The Bank will also follow such reasonable written instructions which the Principal may deliver to the Bank at any time, or from time to time, including to request that BLMIS return assets of the Principal to the Bank and for the Bank to remit cash or cash equivalents to the Principal. However, unless the Bank receives such written directions, the Bank will invest all funds as described in Sections 1 and 2 of this Custodian Agreement.

4. The Bank shall maintain adequate records indicating the ownership by the Principal of investments with BLMIS and held by the Bank as custodian for the Principal. The Principal and the Bank also acknowledge that the Principal has entered into an agreement with PSCC Services Inc. ("PSCCSI"), for services to be provided by PSCCSI with respect to Principal's investments made by BLMIS. The Bank is authorized and directed to coordinate its record keeping

---

[7]     "The principal" refers to the account holder, and "the Bank" refers to WNB.

-23-

with that provided by PSCCSI. The Bank shall serve as custodian hereunder only in the event such agreement between PSCCSI remains in effect. The Bank is further authorized and directed to pay to PSCCSI from the custodial account of Principal established hereunder an annual fee for services provided by PSCCSI an amount equal to .010 of the average assets (determined on an annual basis) held by the Bank under this Custodian Agreement, plus .002 of the amount of each trasnaction effected by BLMIS on behalf of the Principal with a maximum of .025 of average assets. . . .

5. The Bank shall render at least annually statements reflecting the property held by it as custodian hereunder. Such statements shall be rendered to the Principal, or its designated representative. . . .

First, Plaintiffs argue that the agreement required WNB to transmit their funds to BLMIS for short-term trading only and, at all times, to hold their assets in their individual accounts. Their interpretation is belied by the explicit wording of the agreement. The agreement clearly states that all custodial funds would be transferred to BLMIS, to the extent such transfer was acceptable to BLMIS, and maintained in an investment account at BLMIS under the name Westport National Bank. The agreement makes no mention of holding account holders' assets in their individual WNB accounts or transferring the funds to BLMIS for short-term trading purposes only; rather, the agreement states that, should an account holder seek remittances, he must instruct WNB to request that BLMIS return the account holder's assets to WNB.

Despite this clear language, Plaintiffs argue that the agreement's repeated references to WNB's role as "custodian" and its obligation to "hold" Plaintiffs' assets indicate that WNB was required to hold their funds. But these words must be considered in the context in which they are used. "A court will not torture words used in a contract to import ambiguity where the ordinary meaning leaves no room for ambiguity." Neubig v. Luanci Const., LLC, 4 A.3d 1273, 1278 (Conn. App. 2010) (internal citations and quotations omitted). Paragraphs 4 and 5 state that WNB must maintain adequate records and give account holders annual account statements of the funds "held

-24-

by the Bank as custodian for the Principal." These paragraphs, however, having nothing to do with how and where account holders' funds are invested. In fact, the agreement explicitly states that, unless WNB receives instructions from the account holders otherwise, all funds will be invested as described in paragraphs 1 and 2. Therefore, to the extent Plaintiffs' breach of contract claim is based on WNB's investment of Plaintiffs' assets in the BLMIS omnibus account, WNB's motion to dismiss is **granted**.

Second, Plaintiffs argue that WNB breached the agreement by keeping a portion of their funds in a DDA or MMA account for years a time and not investing those assets in the omnibus account at BLMIS.[8] According to the agreement, WNB was required to invest Plaintiffs' funds in WNB's "money market account until the Bank transfers the funds to [BLMIS]" and "to transmit to BLMIS all funds . . . to the extent that the transmission of such funds is practical and acceptable to BLMIS." Thus, to the extent WNB was keeping funds in the MMA account that would have been accepted by BLMIS, it may have breached the agreement. What is unclear, however, is how Plaintiffs were harmed by this alleged breach as the money WNB maintained in the MMA account was the only money *not* stolen by Madoff. Plaintiffs do allege that the MMA account earned little to no interest, so it can be inferred that their damages would be the extra funds they may have accrued had their funds been adequately invested. Therefore, WNB's motion to dismiss Plaintiffs' breach of contract claim based on WNB's permanent placement of their funds in the MMA account is **denied**.

---

[8] This allegation conflicts somewhat with the previous one. Plaintiffs first allege that WNB breached the agreement by keeping their asset at BLMIS indefinitely, but next allege that WNB also breached the agreement by failing to invest a portion of their assets with BLMIS.

Third, Plaintiffs argue that WNB failed to maintain adequate records indicating ownership by account holders of the investments with BLMIS. WNB responds that Plaintiffs have failed to allege how this breach proximately caused their losses. It is possible, however, that WNB's alleged failure to maintain adequate records contributed to WNB's failure to catch the "red flags" or otherwise adequately supervise the accounts. Therefore, the question of proximate cause is more appropriately addressed at a later stage. Therefore, WNB's motion to dismiss Plaintiffs' breach of contract claim based on WNB's inadequate maintenance of records is **denied.**

WNB's motion to dismiss the breach of contract claim is **granted in part and denied in part**. It is granted to the extent Plaintiffs assert that WNB breached the agreement by failing to hold Plaintiffs' assets and by investing the assets with BLMIS indefinitely. It is denied with respect to Plaintiffs' two other breach of contract claims.

## (2) Breach of Fiduciary Duty Against WNB and Silverman (Count III)

Plaintiffs allege that WNB and Silverman breached their fiduciary duties by ignoring red flags contained in the documentation provided by BLMIS and otherwise failing to monitor BLMIS' investment of Plaintiffs' funds. WNB and Silverman respond that the custodial agreements disclaim any fiduciary duties to Plaintiffs.

The Connecticut Supreme Court has held that "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him." Dunham v. Dunham, 528 A.2d 1123, 1134 (Conn. 1987) (internal citations omitted), overruled on other grounds, Sanpietro v. New Haven, 682 A.2d 106, 110 (Conn.

-26-

1996). The court has refused to define the fiduciary relationship "in precise detail and in such a manner as to exclude new situations, choosing instead to leave the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other." Falls Church Group, Ltd., 912 A.2d at 1034 (internal citations and quotations omitted). In addition to considering whether one party has superior knowledge, skill or expertise, the court considers the relative sophistication and bargaining power of the parties and whether one party has placed its trust and access to confidential information in the other. Id. at 1035 (holding that a law firm reasonably believed it could establish a fiduciary relationship between residents of a retirement community and the retirement community's marketing company because of the marketing company's superior knowledge of the resident community's development, the unequal bargaining power of the parties, the advanced age of the residents, and the residents' placement of trust in and disclosure of confidential information, such as income, assets, and health condition, to the marketing company). See also Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 761 A.2d 1268, 1278 (Conn. 2000) ("In the seminal cases in which this court has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another.").

Several of the factors that favor finding a fiduciary relationship are alleged in this case. First, custodial and financial advisor roles by their very nature require a unique degree of confidence and trust between the parties because they involve giving financial advice and investing the other party's assets. Second, Silverman and WNB received copies of BLMIS' monthly account statements and trade confirmations for activities undertaken in the omnibus account and were aware of the inflow and outflow of funds in the omnibus account. This

information—which was not shared with the account holders—equipped WNB and Silverman with superior knowledge regarding BLMIS' purported investment of account holders' funds, which, Plaintiffs contend, should have raised red flags as to BLMIS' operation. (Am. Compl. ¶¶ 6-7, 37.) Third, WNB, a nationally chartered bank with a custodial division, and Silverman, the president of a pension consulting and actuarial firm, were vastly more sophisticated than their counterparts, individuals who sought custodial accounts for their retirement funds.

WNB responds that Plaintiffs cannot lay claim to fiduciary protections in the face of clear contract language to the contrary. In particular, WNB asserts that the custodial agreements contain limitations on its duties and disclaimers to its potential liability, such as: (1) the account holder "has not relied on the Bank in choosing to give BLMIS full discretionary authority"; (2) "the Bank is acting solely in a ministerial capacity;" (3) "the Bank assumes no responsibility for the investment performance of BLMIS"; and (4) the account holder "will hold the Bank harmless from any liability to BLMIS incurred by the Bank resulting from the performance of investments."[9]

It is clear from the contract language that BLMIS had total control over the investment of Plaintiffs' assets and that WNB could not be held liable for the performance of assets held and invested by BLMIS. What is less clear, however, is the extent of WNB's and Silverman's obligations to ensure that BLMIS was actually investing Plantiffs' assets rather than stealing them. Because WNB and Silverman were privy to a wealth of information regarding BLMIS' alleged investment of Plaintiffs' assets that Plaintiffs were not privy to, they were in a much

---

[9]    The custodial agreements contain no corresponding limitations on Silverman's duties or disclaimers to his liability.

better position to ensure that Plaintiffs' assets were actually being held in the BLMIS omnibus account and invested as the custodial agreements required. Therefore, the Court cannot conclude as a matter of law that no fiduciary relationship existed between Defendants and Plaintiffs. See id. at 1034 ("In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence.").

WNB also argues that the breach of fiduciary duty claim, as well as the negligence and CUTPA claims, are barred by the economic loss doctrine. "The economic loss doctrine is a judicially created principle which prohibits recovery in tort where the basis for that tort claim arises from the violation of a contract and damages are limited to purely economic losses as opposed to personal injury or property damages." Town of New Canaan v. Brooks Laboratories, Inc., No. FST-CV-054006797S, 2007 WL 4214227, at *2 (Conn. Super. Nov. 7, 2007) (internal citations and quotations omitted). In William Fords, Inc v. Hartford Courant Co., 657 A.2d 212, 222 (Conn. 1995), the Connecticut Supreme Court refused to adopt the economic loss doctrine in a case alleging both breach of contract and negligent misrepresentation. Three years later, however, in Flagg Energy Dev. Corp. v. Gen. Motors Corp., 709 A.2d 1075, 1088 (Conn. 1998), the Connecticut Supreme Court decided to apply the doctrine to a case involving a contract for the sale of goods governed by the Uniform Commercial Code. Id. at 153 ("We agree with the holdings of cases in other jurisdictions that commercial losses arising from the defective performance of *contracts for the sale of goods* cannot be combined with negligent misrepresentation.") (emphasis added).

-29-

Since then, Connecticut trial courts have split over whether the economic loss doctrine applies to all contracts cases or just contracts governed by the Uniform Commercial Code. See, e.g., Town of New Canaan, 2007 WL 4214227, at *4 (refusing to extend economic loss doctrine to all contract cases and holding that the Flagg decision was premised on the negligent misrepresentation claim conflicting with the provisions of the UCC); Riggs-Brewer Indus., Inc. v. Shelton Senior Housing, Inc., No. CV-044000365, 2006 WL 1738231, at *6 (Conn. Super. Ct. June 6, 2006) (refusing to apply economic loss doctrine to contract for performance of services). But see Dart Chart Sys. v. Kettle Brook Care Ctr., LLC, No. CV095025871S, 2009 WL 1959487, at *4 (Conn. Super. Ct. June 5, 2009) (applying economic loss doctrine to a contract that provided web-based computer programs to a nursing home administration). Because of the lack of clear Connecticut law regarding the scope of the doctrine, this Court finds that the economic loss doctrine cannot bar Plaintiffs' breach of fiduciary duty, negligence and CUTPA claims. See Factory Mut. Ins. Co. v. Pike Co., No. 3:08-cv-1775 (VLB), 2009 WL 1939799, at *3 (D. Conn. July 6, 2009) (declining to apply economic loss doctrine to a non-UCC contract in the absence of clear authority from the Connecticut Supreme Court).

The Court has found that Plaintiffs have adequately pled a fiduciary duty on the part of Defendants and that the economic loss doctrine does not bar their claims. Therefore, WNB's and Silverman's motions to dismiss the breach of fiduciary duty claims against them are **denied.**

**(3) Negligence Against WNB and Silverman (Count V)**

-30-

Plaintiffs also assert that WNB and Silverman were negligent in their handling of the custodial accounts. Silverman argues that the negligence claim is inadequately pled because the Amended Complaint fails to allege that he or WNB owed a duty of care or that their conduct was a proximate cause of Plaintiffs' losses.

"Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action." Goldsich v. City of Hartford, 571 F. Supp. 2d 340, 344 (D. Conn. 2008) (quoting Ryan Transp. Inc. v. M&G Assocs., 832 A.2d 1180, 1184 (Conn. 2003)).

> The test for the existence of a legal duty entails (1) a determination of whether an ordinary person in defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case.

Ryan Transp. Inc., 832 A.2d at 1184 (internal citations and quotations omitted). Silverman argues that the limitations on WNB's duties and the disclaimers on WNB's liability described in the custodial agreement indicate that Silverman and WNB did not have a duty to protect Plaintiffs' funds. As an initial matter, the disclaimers and limitations in the custodial agreement apply to WNB only, not PSCCSI or Silverman, so Silverman cannot claim the benefit of these provisions.[10] In any event, as discussed in the breach of fiduciary duty section *supra*, the Court is not convinced that the contract language disclaimed all obligations on behalf of WNB to

---

[10]     PSCCSI is mentioned in Paragraph 4 only, which states that the account holder had entered into a separate agreement with PSCCSI "for services to be provided by PSCCSI with respect to the Principal's investments made by BLMIS," that WNB "is authorized and directed to coordinate its record keeping with that provided by PSCCSI", and that WNB is authorized to pay PSCCSI an annual fee from the custodial account.

safeguard account holders' assets. Only WNB and Silverman had access to documentation that would have raised questions about BLMIS' purported investment of Plaintiffs' assets. Therefore, the Court finds that Plaintiffs have adequately pled a duty on the part of BLMIS and WNB to take reasonable steps to protect their assets.

Plaintiffs have also adequately pled that WNB and Silverman proximately caused their losses. "An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm." Coburn v. Lenox Homes, Inc., 441 A.2d 620, 627. (Conn. 1982). Proximate cause, which is ordinarily a question of fact, depends on whether the harm that occurred was of the same general nature as the foreseeable risk created by the defendant's negligence. Id. Although Madoff undoubtedly was the primary cause of Plaintiffs' losses, WNB's and Silverman's actions may be proximate causes of Plaintiffs' losses as well if their allegedly negligent supervision of the accounts facilitated Madoff's fraud and the fraud was a foreseeable risk of their negligent actions. "[A] negligent defendant, whose conduct creates or increases the risk of a particular harm and is a substantial factor in causing that harm, is not relieved from liability by the intervention of another person, except where the harm is intentionally caused by the third person *and is not within the scope of the risk created by the defendant's conduct*." Tetro v. Town of Stratford, 458 A.2d 5, 8 (Conn. 1983) (emphasis added). The Court cannot say as a matter of law that the theft of Plaintiffs' assets was not within the scope of the risk created by Defendants' negligent supervision of the BLMIS omnibus account. WNB's and Silverman's motions to dismiss the negligence claim are **denied**.

**(4) Violations of the Connecticut Unfair Trade Practices Act Against WNB and Silverman (Count VII)**

The Connecticut Unfair Trade Practice Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110(b). It provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . ." Id. In analyzing whether a practice violates CUTPA, the Connecticut Supreme Court has adopted the following criteria, known as the "cigarette rule": (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive or unscrupulous, and (3) whether it causes substantial injury to consumers. Edmans v. CUNO, Inc., 892 A.2d 938, 954 n.16 (Conn. 2006). A practice may be unfair because of the degree to which it meets one criteria or because to a lesser extent it meets all three. Id.

The Amended Complaint alleges that WNB's conduct offended public policy because it violated federal banking regulations. The BLMIS omnibus account, which contained various WNB account holders' IRA and pension funds, constituted a collective investment fund and was held by WNB in a fiduciary capacity within the meaning of C.F.R. § 9.2. As a result, WNB was required to maintain adequate safeguards and controls to protect the funds placed in the omnibus account by, *inter alia*, performing a due diligence review of BLMIS before establishing the omnibus account and periodically thereafter and reviewing the operational controls and financial

condition of BLMIS. Plaintiffs contend that WNB's failure to adequately safeguard their assets caused them to lose their retirement savings.

These allegations sufficiently state a CUTPA claim against WNB. What is glaringly absent from these allegations, however, is how Silverman's conduct violated CUTPA. Plaintiffs do not assert that his conduct is regulated by federal banking regulations, instead claiming in a conclusory fashion that his conduct was immoral, unethical, oppressive and unscrupulous. Their allegations elsewhere in the Amended Complaint that Silverman breached his fiduciary duty by failing to investigate red flags in the documentation provided by BLMIS and otherwise safeguard their assets does not suggest immoral, unethical, oppressive or unscrupulous conduct. Because Plaintiffs have failed to plead any deceptive conduct on the part of Silverman, the CUTPA claim against him cannot survive the pleadings stage.[11] The motion to dismiss the CUTPA claim is **denied** as to WNB but **granted** as to Silverman.

### (5) Unjust Enrichment and Money Had and Received Against WNB and Silverman (Counts IX and XI)[12]

A claim for unjust enrichment allows a plaintiff to "recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties." Alstom Power, Inc. v. Schwing America, Inc., No. 3:04-cv-1311, 2006 WL 2642412, at *5 (D. Conn.

---

[11]     WNB also argues that the CUTPA claim should be dismissed because CUTPA does not apply to deceptive conduct in the purchase or sale of securities. Russell v. Dean Witter Reynolds, Inc., 510 A.2d 972, 977 (Conn. 1986). However, Plaintiffs have not alleged that WNB's conduct was deceptive, but rather that it violated federal regulations.

[12]     Money had and received "is the equivalent of the more modern action for unjust enrichment." Gold v. Rowland, 995 A.2d 106, 118 n.10 (Conn. 2010).

Sept 14, 2006) (internal citations and quotations omitted). WNB argues that, because an express contract existed between it and Plaintiffs, Plaintiffs cannot maintain an unjustment enrichment claim. Id. ("[W]here an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is unavailable.").

Plaintiffs respond that they should be allowed to plead in the alternative that, in the event that they cannot recover for breach of contract, they should be able to recover for unjust enrichment. See List Servs. Corp. v. Ampere Media, LLC, No. DBDCV0850049265, 2010 WL 2927420, at *7 (Conn. Super. Ct. Sept. 20, 2007) (holding that unjust enrichment can be pled in the alternative because "it is the lack of a *remedy* under the contract [that] is a precondition for recovery based on unjust enrichment") (emphasis in original) (internal citations and quotations omitted). The Court will permit Plaintiffs to plead unjust enrichment in the alternative against WNB. The motion to dismiss the claims for unjust enrichment and money had and received is **denied**.

**(6) Constructive Trust Against WNB and Silverman (Count XIII)**

WNB and Silverman move to dismiss the constructive trust cause of action on the basis that Connecticut law does not recognize it as an independent cause of action. Cendant Corp. v. Shelton, 474 F. Supp. 2d 377, 383 (D. Conn. 2007) ("[T]here is no separate cause of action under Connecticut law for constructive trust, but rather a constructive trust is a remedial device designed to prevent unjust enrichment."); see also Macomber v. Travelers Prop. & Casual Corp., 804 A.2d 180, 185 n.3 (Conn. 2002) (noting that imposition of a constructive request is a remedy

and not a substantive cause of action).  Because constructive trust is not an independent cause of action under Connecticut law, the motion to dismiss is **granted**.

## IV. CONCLUSION

For the foregoing reasons, TD Banknorth's motion to dismiss  [Doc No. 196] is **granted**, Silverman's motion to dismiss [Doc. No. 193] is **granted in part and denied in part**, and WNB's motion for judgment on the pleadings [Doc. No. 231] is **granted in part and denied in part**.  The claims against Silverman for violation of CUTPA and constructive trust are dismissed, and the claims against him for breach of fiduciary duty, negligence, unjust enrichment, and money had and received are not dismissed.  The claim against WNB for breach of contract is dismissed in part, the claim for constructive trust is dismissed in its entirety, and the remaining claims against WNB are not dismissed.

SO ORDERED.

Dated at New Haven, Connecticut, this *14th* day of December, 2010.

/s/ Peter C. Dorsey, SUSD.

Peter C. Dorsey, U.S. District Judge
United States District Court