UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHEN R. LEVINSON; RICHARD E. LAYTON; and DR. R. LAYTON P.A. 401(K) PLAN | : | |
| | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. 3:09cv269(VLB) |
| | : | |
| v. | : | |
| | : | |
| WESTPORT NATIONAL BANK; | : | SEPTEMBER 28, 2012 |
| TD BANKNORTH NA; | : | |
| And ROBERT L. SILVERMAN, | : | |
| DEFENDANTS. | : | |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. #354] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT [DKT. #372]

This action arises out of the Ponzi scheme perpetrated by Bernard L. Madoff.  Two individuals and a pension and profit-sharing plan, along with the class they represent (collectively the "Plaintiffs"), have brought this action against: (1) Westport National Bank ("WNB"), the custodian of their retirement investments; and (2) Robert L. Silverman, the president of PSCC Services, Inc. ("PSCCSI"),[1] the Plaintiffs' pension consulting and actuarial firm (collectively the "Defendants").[2]  The Plaintiffs and the class they seek to represent maintained

---

[1] The Plaintiffs named PSCCSI as a Defendant in their original class action complaint but, because PSCCSI filed a bankruptcy petition in April 2009, did not name PSCCSI as a Defendant in their first amended class action complaint.  (First Am. Class Action Compl. at 1 n.1.)

[2] This Court dismissed, as barred by the relevant statute of limitations, all claims against another Defendant, TD Banknorth, N.A., in its December 29, 2010 ruling on the Defendants' respective motions to dismiss and for judgment on the pleadings.  *Levinson v. PSCC Services, Inc.*, No. 3:09-cv-269 (VLB), 2010 WL

custodial accounts with WNB for their investments.  WNB invested the Plaintiffs'
assets with Bernard L. Madoff Investment Securities, LLC ("BLMIS").  After
Madoff admitted his fraud, the Plaintiffs realized that their investments were lost
and commenced this class action.

The Plaintiffs originally brought this putative class action in February 2009.
After this Court dismissed their complaint with leave to amend, the Plaintiffs filed
the first amended class action complaint on January 19, 2010, asserting several
causes of action.  Upon the Defendants' motions, this Court dismissed or entered
judgment on the pleadings in favor of the Defendants with respect to several
claims.  The only claims still active, see discussion, *supra* at 1 n.2, are the
Plaintiffs' claims against WNB for (1) breach of contract, (2) breach of fiduciary
duty, (3) negligence, (4) violations of CUTPA, (5) unjust enrichment, and (6)
money had and received.

The Plaintiffs have moved, pursuant to Federal Rule of Civil Procedure 56,
for partial summary judgment on their breach of contract, CUTPA, and money had
and received claims [Dkt. # 354].  WNB has, in an amended motion, similarly
moved for summary judgment on all of the Plaintiffs' claims [Dkt. # 372].  Because
this Court concludes that triable issues exist with respect to some, but not all, of

5477250, at *6-7 (D. Conn. Dec. 29, 2010) (ruling on motions to dismiss and
motion for judgment on the pleadings).  In addition, on March 18, 2011, Silverman
filed a bankruptcy petition in the United States Bankruptcy Court for the District
of Connecticut and a notice of the petition in this Court on March 31, 2011 [Dkt. #
283]; although Silverman has not formally invoked the automatic stay protections
of 11 U.S.C. § 362 (2006), his counsel has withdrawn, and he is no longer actively
litigating this matter.  WNB is therefore the only remaining active Defendant.

the Plaintiffs' claims, the Plaintiffs' motion [Dkt. # 354] is DENIED and WNB's amended motion [Dkt. # 372] is GRANTED IN PART and DENIED IN PART.  WNB's earlier motion for summary judgment, superseded by the amended motion [Dkt. #358] is DENIED AS MOOT.

I.    **Background**[3]

       In December 2008, when Madoff admitted his Ponzi scheme and BLMIS collapsed, the Plaintiffs had been investors with BLMIS for up to two decades, and WNB had served as custodian of their investment accounts with BLMIS since 1999.  The gravamen of the Plaintiffs' claims is that, during its time as custodian, WNB breached its contractual and common law duties to the Plaintiffs by impermissibly commingling their assets, relying on information provided by BLMIS, and making no effort to monitor BLMIS or verify this information.  The Plaintiffs argue that WNB's conduct entitles them to recover improperly assessed fees paid to WNB, as well as their investment principal and lost investment income which they could reasonably have anticipated earning if they had known that BLMIS was a fraudulent enterprise instead of an investment firm.

       The parties have filed voluminous evidentiary submissions in the summary judgment briefing process.  This ruling will briefly summarize this evidence, reserving some facts for discussion of the merits of the parties' respective motions.

---

[3] The facts set forth in this section are undisputed unless otherwise noted.

A.      The Plaintiffs' custodial accounts with WNB.

The Plaintiffs were clients of PSCC, Inc. and PSCC Services, Inc. (collectively "PSCC"), pension and retirement plan consulting services companies operated by Robert L. Silverman.  (WNB's L.R. 56(a)(1) Stmt. ¶ 1.) PSCC provided pension and retirement plan consulting services for the Plaintiffs. (*Id.*)  In 1986, Silverman entered into an arrangement with Madoff whereby PSCC clients would invest with BLMIS through an intermediary custodian of their assets; the intermediary custodian would hold an omnibus account at BLMIS composed of the combined investments of the PSCC clients.  (*See id.* ¶¶ 1, 9.)

Initially, Westport Bank and Trust ("WBT") served as the intermediary custodian.  (*Id.* ¶ 1.)  In 1999, after WBT was acquired by Hudson United Bank ("HUB"), HUB terminated the custodial arrangement with PSCC and BLMIS.  (*Id.* ¶ 9.)  PSCC approached WNB about serving as custodian of the PSCC clients' investments with BLMIS, and WNB agreed.  (*Id.*)  The Plaintiffs terminated their accounts at WBT and opened new accounts at WNB. Thereupon, BLMIS transferred the assets in the omnibus account in WBT's name to a new omnibus account in WNB's name.  (*Id.* ¶¶ 9-10.)  At the time of the transfer, neither PSCC, WBT nor WNB verified the account balances reported by BMLIS. None of the entities conducted an audit the omnibus account or took any other steps to verify either that there were any actual assets in the omnibus account or the amount of such assets. No funds were deposited in WNB.  (Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 29, 32.)

4

Each Plaintiff entered into a separate custodial agreement with WNB which governed the custodial relationship.  All of the agreements were identical.  The agreements provide that WNB would undertake to perform certain specified functions.  WNB agreed to act as custodian with respect to all funds transmitted to WNB by Plaintiffs and invest Plaintiffs' funds in an omnibus account maintained at Bernard L. Madoff Investment Services, Inc. ("BLMIS").  (Whatley Decl. Ex. 49, at 1.)  The agreements state that "[WNB] shall accept such property from [the Plaintiffs,] and [WNB] shall invest all such cash and cash equivalents held hereunder, and any interest, dividend or other income earned from property held by [WNB] hereunder, in [WNB's] deposit money market account until [WNB] transfers the funds to [BLMIS]."  *Id.*  In addition, as described below, WNB was responsible for paying fees to itself and PSCC.

Each agreement provides that WNB had only a limited role in the Plaintiffs' investment strategy: "Principal has chosen BMLIS to receive and invest Principals funds and has not relied on the Bank in choosing to give BLMIS full discretionary authority."  (*Id.*) "[WNB] has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS; . . . [WNB] is acting solely in a ministerial capacity; . . . [and WNB] assumes no responsibility for the investment performance of BLMIS."  (*Id.*)  But the agreements also provide that WNB has certain other responsibilities: WNB "shall maintain adequate records indicating the ownership by [the Plaintiffs] of investments with BLMIS and held by [WNB] as custodian for [the Plaintiffs]" and "shall render at least annually statements reflecting the property held by it as custodian hereunder."

5

(*Id*. at 2.)  "The Principal and the Bank also acknowledge that the Principal has entered into an agreement with PSCC . . . for services to be performed by. . . [PSCC] with respect to Principal's investments made by BMLIS. The Bank is authorized and directed to coordinate its recordkeeping with that provided by PSCC." ."  (*Id*. at 4.)

The contracts also govern the Plaintiffs' payment of fees to WNB and PSCC; the fees due to both entities depended on the "average assets" held on behalf of the PSCC clients.  For services prior to December 31, 2004, PSCC received "an amount equal to .010 of the average assets (determined on an annual basis) held by [WNB] under this Custodian Agreement, plus .002 of the amount of each transaction effected by BLMIS on behalf of [the Plaintiffs] with a maximum of .025 of average assets."  (*Id*.)  For services after December 31, 2004, PSCC received "an amount equal to .006 of the assets at the time of billing held by [WNB] under this Custodian Agreement," plus any separately itemized "administrative services."  (*Id*. at 3.)  WNB received "fees . . . of .006 of the average assets held hereunder (determined on an annual basis)."  (*Id*. at 2.) Lastly, the agreements provide that WNB "is further authorized and directed to pay to [PSCC] from the custodial account of Principal established hereunder." (*Id*.)

B.     WNB's administration of the Plaintiffs' accounts.

WNB held the Plaintiffs' total assets in two types of investments: (1) the omnibus account with BLMIS, which held the Plaintiffs' investments in

combination with the other PSCC clients, and (2) cash in multiple custodial services accounts at WNB which WNB used to receive deposits from investors, receive disbursements from BLMIS, and pay fees to itself and PSCC.  (WNB's L.R. 56(a)(1) Stmt. ¶¶ 28.)

The Plaintiffs therefore held proportionate investment interests in a common pool of assets composed of the omnibus account at BLMIS and the custodial services accounts at WNB.  (*Id.*)  WNB attempted to have a cash balance in the custodial services accounts at all times.  (Clark-Weintraub Decl. Ex. 31, at 47:17-48:13.)  WNB would make the determination about when to transfer money and would do so to adjust the balance based on anticipated future cash needs.  (*Id.* at 47:17-48:13, 138:3-139:4; *see also* Whatley Decl. Ex. 3, at 169:15-25.)  WNB administered the custodial services accounts in a manner which minimized the number of transfers which took place between WNB and BLMIS; when a customer deposited cash, WNB adjusted that customer's *pro rata* interest in the common pool of assets but typically did not send the money to BLMIS.  (Clark-Weintraub Decl. Ex. 31, at 63:9-65:25.)  Instead, the money stayed in the custodial services account in order to fund distributions and fee payments. (*Id.* at 63:9-65:25, 183:13-25.).  Because distributions and fee payments outpaced contributions during WNB's nine-year tenure as custodian, WNB typically requested funds *from* BLMIS between six and eight times per year but only transferred funds *to* BLMIS twice, once in 2001 and once in 2004.  (Clark-Weintraub Decl. Ex. 31, at 91:21-25; Whatley Decl. Ex. 40, at 287:12-290:20.)

WNB calculated the value of this proportionate investment interest in the common pool of assets, the net asset value ("NAV"), periodically.  (Clark-Weintraub Decl. Ex. 27, at 38:11-17, 39:24-40:8.)  WNB's fees, and part of PSCC's fees, were calculated based on the NAV of the combined pool of assets.  (WNB's L.R. 56(a)(1) Stmt. ¶ 50.)  WNB calculated the NAV based on the reported value of the combined pool of assets, including the value BLMIS reported in its monthly statements sent to WNB.  (*See id.*)  WNB made some attempts to verify some of the information in the monthly statements BLMIS sent to WNB, but WNB neither comprehensively verified the BLMIS monthly statements nor audited BLMIS. (Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 29, 32; WNB's L.R. 56(a)(2) Stmt. ¶¶ 29, 32.)

The Plaintiffs received annual statements from WNB.  (Pl.'s L.R. 56(a)(1) Stmt. ¶ 30; WNB's L.R. 56(a)(2) Stmt. ¶ 30.)  These statements provided the total value of their investment, the value of each share of their respective BLMIS investment, and number of shares owned, as well as with the market value of their investment one year earlier.  (*See generally*, *e.g.*, Whatley Decl. Ex. 23.)  The statements also detailed any additional investment by the Plaintiffs during the year (identified as a cash deposit followed by a purchase of shares in a BLMIS investment), as well as the fees deducted for payment to WNB and PSCC (identified as a sale of shares in a BLMIS investment followed by a deduction for administrative or record-keeping fees to PSCC or custodial fees to WNB).  (*Id.*)

C.     The aftermath of BLMIS' collapse.

WNB asserts that Madoff was arrested, and his Ponzi scheme uncovered, on December 11, 2008. At that time, it became clear that Madoff misappropriated assets as soon as they were deposited with BLMIS (*see* Pl.'s L.R. 56(a)(1) Stmt. ¶ 14), and that the trade confirmations and monthly account statements BLMIS sent to WNB had been fabricated (*id.* ¶ 33). The omnibus account at BLMIS in WNB's name actually held no assets and had never held any assets. (*Id.* ¶¶ 14, 33; WNB's L.R. 56(a)(1) Stmt. ¶ 34.)

On December 12, 2008, WNB acknowledged, in a letter to all the PSCC clients including the Plaintiffs, the "recent allegations involving Bernard Madoff" and reminded Plaintiffs that, pursuant to their custodial agreements, they could request return of their assets by delivering the request to WNB. (Clark-Weintraub Decl. Ex. 55.) In connection with the liquidation of BLMIS pursuant to the Securities Investor Protection Act ("SIPA"), the individual Plaintiffs filed claims with the SIPA trustee in the United States Bankruptcy Court for the Southern District of New York. (Thielmann Decl. Exs. A, B.) WNB filed a statement in support of the claims submitted by the Plaintiffs and other PSCC clients. (*Id.* Ex. A.) The SIPA trustee denied the Plaintiffs' claims in April 2011 because the Plaintiffs did not have accounts with BLMIS and therefore did not qualify for SIPA protection. (*Id.* Ex. B, at 5.)

The Plaintiffs filed this lawsuit as a putative class action on February 13, 2009. The Plaintiffs seek to recover their investment principal, lost investment income, and fees paid to WNB and PSCC. As of December 11, 2008, the reported value of the total investments of all the class members with BLMIS was almost

**9**

$60 million.  (Pl.'s L.R. 56(a)(1) Stmt. ¶ 6.)  Plaintiffs claim that, during the time that WNB served as custodian, it deducted over $2.8 million in fees for itself and over $12.6 million in fees for PSCC.  (*Id.* ¶ 33.)

## II.    Summary Judgment Standard

The standard for deciding the cross-motions for summary judgment is familiar.  Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine disputes as to any material fact exist, and summary judgment is therefore appropriate, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But "[c]onclusory allegations will not suffice to create a genuine issue."  *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

On cross-motions for summary judgment, the same standard applies.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving

party." *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citing *Morales*, 249 F.3d at 121).

III.    Discussion

A.    Breach of Contract

Plaintiffs advance four theories with respect to their breach of contract claim.  First, Plaintiffs argue WNB breached the custodial agreement in its administration of the custodial clearing accounts through the comingling of funds.  Second, Plaintiffs argue that WNB breached Paragraph 7 of the custodial agreement by failing to return Plaintiffs' contributions as soon as practicable. Third, Plaintiffs argue that WNB breached the custodial agreement in its calculation of fees based on "assets."  Lastly, Plaintiffs argue that WNB breached the custodial agreement by failing to maintain adequate records and statements. The Court will therefore examine these theories independently.

In Connecticut,[4] a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages directly and proximately caused by the breach.  *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504, 890 A.2d 140 (2006).

In determining whether breach has occurred, the court must ascertain the contractual rights and obligations of the parties.

---

[4] **None of the parties dispute that Connecticut substantive law applies to the custodial agreements.**

> In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . .  Where the language is unambiguous, we must give the contract effect according to its terms. . . .  Where the language is ambiguous, however, we must construe those ambiguities against the drafter. . . .  [A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity . . . .  Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous . . . .  In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself . . . .  [A]ny ambiguity in a contract must emanate from the language used by the parties . . . .  The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so . . . .  If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous.

*Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260-61, 14 A.3d 284 (2011) (quoting *Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005)).

Where a contract term is ambiguous, the court may properly discern the intent of the parties as to the meaning of the contract by considering extrinsic evidence.

*United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 675, 791 A.2d 546 (2002).  "[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."  *Gurguis v. Frankel*, 93 Conn. App. 162, 168, 888 A.2d 1083 (2006).  "Proximate cause is ordinarily a question of fact."  *Id.*

### 1.    Administration of custodial clearing accounts

First, Plaintiffs argue that they are entitled to summary judgment on their breach of contract claim because the custodial agreements required WNB to transmit their deposits to BLMIS within a reasonable time and did not permit the *pro rata* ownership of both the clearing accounts and the omnibus account at BLMIS which WNB used instead.  Plaintiffs argue that no provision of the custodial agreement authorized WNB to utilize one account owner's funds to pay other customers' redemptions and fees.  Plaintiffs essentially argue that WNB breached the agreement by comingling each Plaintiff's account contributions together.  WNB argues that summary judgment in its favor is appropriate because the contract unambiguously permitted it to manage the custodial relationship as it did and that the custodial agreement did authorize grouping of customers' funds and required transmission of funds to BLMIS when practical.

### a.  Breach

WNB argues that the plain language of Paragraph 2 of the custodial agreement required WNB to group the customer's funds with those of other custodial customers and therefore there cannot be any breach.  Paragraph 2 provides in relevant part that the "Principal hereby authorizes the Bank to transmit to BLMIS all funds received by the Bank from the Principal to the extent the first transmission of such funds is practical and acceptable to BLMIS . . . It is understood and acknowledged that the funds of the Principal which are transmitted to BLMIS will be grouped with funds of other persons of entitles for

investment with BLMIS." (Whatley Decl. Ex. 49.)  Defendants further argue that it was practical to comingle and maintain the investor funds in this way and therefore its conduct was permissible under the contract.  On the other hand, Plaintiff argues that this language in Paragraph 2 does not permit WNB to comingle investor's funds in a checking account at WNB to pay the fees of other custodial accountholders.

Here, WNB's argument presumes that the term "practical" modifies or relates to its own conduct.  In other words, WNB presumes that pursuant to this language, it is empowered to determine whether the transmission of the funds is practical.  However, this language is ambiguous as it could easily modify or relate to BLMIS and not WNB.  Particularly in view of the fact, that the term "practical" is modified by the phrase "to BLMIS" in the same sentence.  Therefore this language could just as easily be interpreted to empower only BLMIS to determine whether the transmission of the funds is practical and not WNB.  If the Court credited WNB's interpretation of this sentence that could have the effect of rendering the phrase "to BLMIS" meaningless in the sentence.  A "contract must be construed to give meaning to each term in the context of the entire agreement."  *Gerardo v. Laraia*, No.CVN98091696BU, 2001 WL 283019, at *9 (Conn. Super. Ct. Feb. 6, 2001); *Linemaster Switch Corp. v. Aetna Life and Cas. Corp.* No.CV09-0396432S, 1995 WL 462270, at *14 (Conn. Super. Ct. July 25, 1995) ("Especially where there is a claim of ambiguity a court must attempt to give meaning to every word of a contract") (citing *Downs v. Nat'l Casualty Co.*, 146 Conn. 490, 495 (1959)).

Although, the terms of the contract do contemplate that the funds will be grouped together as WNB points out, it is ambiguous whether the funds could be comingled for an extended period of time or whether the funds could only be comingled immediately prior to and after transfer to BLMIS.  The language in Paragraph 2 provides that the funds "will be grouped with funds of other persons or entities for investment with BLMIS."  The term "for investment" could be interpreted to mean that WNB could only transfer a Principal's funds the bank's money market fund to a single fund in order to transfer the funds to WNB's custodial account at BLMIS.  The grouping or comingling of the funds is only mentioned in the Custodial Agreement in connection with a transfer of funds to BLMIS, which WNB admits it only did twice in the nine years it served as custodian for Plaintiffs.

The "practical" language in Paragraph 2 that WNB relies on patently refers to the manner in which the funds are transmitted as opposed to the manner in which the funds were held or stored.  Courts must "accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract." *Ramirez v. Health Net of the Northeast, Inc.,* 285 Conn. 1, 13 (2008).  Transmit is defined as "to send or convey from one person or place to another."  *Transmit Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/transmit (last visited August 1, 2012).   Therefore the language in Paragraph 2 that WNB is authorized to transmit funds "to the extent that the transmission of such funds is practical and acceptable to BLMIS" could

reasonably be interpreted to be limited to the two instances in which WNB actually transferred funds to BLMIS and would have no applicability to how WNB maintained each investor's custodial accounts when not transmitting any funds to BLMIS.   As Plaintiffs point out, the agreement in Paragraph 1 actually provides that when WNB is not transmitting funds to BLMIS that WNB "shall invest all such cash and cash equivalents held hereunder, and any interest dividend or other income earned from property held by the Bank, hereunder, in the Bank's deposit money market account until the Bank transfers the funds to [BMLIS]." (Whatley Decl. Ex. 49.)

Moreover, the other provisions of the contract appear to contemplate that WNB would maintain individual investor accounts as opposed to a single comingled account.  For example, Paragraph 4 provides that WNB was "authorized and directed to pay PSCCI from the custodial account of Principal established hereunder an annual fee" which suggests that each investor had an individual custodial account.  (Whatley Decl. Ex. 49, at 1.)  Additionally, each Plaintiff executed a separate custodian agreement as opposed to being signatories to a master custodian agreement which again suggests that it was the parties' intent to maintain individual custodial accounts for investment with BLMIS.  Each custodial agreement stated that the Participant's deposits, together with any income derived therefrom, would be held in the bank's deposit money account.  No mention is made of the deposits being held together with the deposits of other customers of the bank or the income on deposits of other customers of the WNB.

16

Consequently, the language in Paragraph 2 is somewhat ambiguous as to whether it permitted WNB to determine the manner it held funds that were not in transmission to BMLIS and whether it was permissible to comingle funds in a single account as was done.  In addition, there are no terms in the agreement that expressly permits WNB to use the funds of other investors in the comingled account to fund redemption payments to other custodial account holders as it did.  Considering that the Court must construe any ambiguities against the drafter and when viewed in the light most favorable to the Plaintiffs or WNB, genuine issues of material fact exists as to whether the contract permitted WNB to maintain the funds as it deemed practical in a comingled account.  Therefore, while it could be argued that there is more evidence that commingling was impermissible than there is that it was permissible, such factual issues are not the province of the Court.  Consequently, there are triable issues of fact as to whether there was a breach of agreement by WNB in its administration of the custodial clearing account.

### b.  Causation

WNB further argues that, even if it breached the custodial agreements by comingling funds, the Plaintiffs cannot succeed on their claim because they cannot show that this breach caused them any damages.   WNB argues that it unclear how the Plaintiffs were harmed if it had not comingled the funds and instead immediately transferred every deposit to BLMIS as the only money not stolen by Madoff was the money WNB maintained in the comingled clearing account.

17

Plaintiffs argue that WNB's failure to transfer the funds immediately harmed them because the Madoff Trustee has taken the position that Plaintiffs and Class members have no recourse against the BLMIS estate because their funds never reached Madoff.  (Pl. Reply Mem. in support of Summary Judgment p. 8.)  Therefore, Plaintiffs argue they were harmed because "WNB's failure to send the money to BLMIS was the basis for the Trustee's denial of Class members' claims" under SIPA.  (*Id.* at 10.)  In support of their argument, Plaintiffs submit that "Plaintiffs' counsel has been expressly informed by the Trustee's counsel that, because WNB failed to transfer the vast majority of funds deposited by Class members into their custodial accounts at the Bank to Madoff, there had been no entrustment of cash or securities to BLMIS and, therefore, the Class members had no claims against the BLMIS estate for recovery of these amounts . . . Thus, Class members have been injured by WNB's failure to transfer the funds to BLMIS, because they now have no recourse against the BLMIS estate to recover those funds."  (*Id.* at 16).

Here, Plaintiffs' SIPA argument is unavailing as the Madoff Trustee's decision was not predicated on WNB's failure to send money to BLMIS as Plaintiffs inexplicably contend but rather because the individual Plaintiffs did not have an account with BLMIS.  *See* (Thielmann Decl. Exs. A, B.)  The Madoff Trustee clearly and unambiguously concluded that only WNB would be entitled to SIPA protection because it held the account at BLMIS and therefore it was WNB and not the Plaintiffs who entrusted BLMIS with cash or securities for purpose of trading or investing in securities.  Moreover, Plaintiff's attempt to lend credence

18

to their unsupported theory by submitting that Plaintiffs' counsel has been informed by Trustee's Counsel that the failure to transfer the money was the Trustee's real reason for denial of their claims is patently inadmissible hearsay.

Moreover, even if Plaintiffs' SIPA theory was credible Plaintiffs would likely not be able to recover for such damages. "The Restatement (Second) of Contracts divides a defendant's recovery into two components: (1) direct damages, composed of 'the loss in value to him of the other party's performance caused by its failure or deficiency'; plus, (2) 'any other loss, including incidental or consequential loss, caused by the breach ....'" *City of Milford v. Coppola Const. Co., Inc.*, 93 Conn.App. 704, 715 (2006) (quoting 3 Restatement (Second), Contracts §347 (a) and (b) (1981)). "'[D]amages resulting from a breach of contract may be divided into those which flow naturally and usually from the breach itself, or general damages, and those which do not naturally and usually flow from such a breach, but did in this case, or special or consequential damages. As to the former, the parties need not actually have considered the possibility of their occurrence, as long as they may fairly be supposed to have considered them, while, as to the latter, to be recoverable, they must meet the requirements of causation, certainty, and foreseeability, that is, be such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract. Stated another way, when a defendant has reason to know, before entering into the contract in question, of facts indicating that particular, though unusual, damages will follow or may follow the defendant's

failure to perform its agreement, the defendant is liable for such damages.'"  *Id.* (quoting 24 S. Williston, Contracts (4th Ed. Lord 2002) §64:12. Pp. 130-32).

"General damages are considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events. Such damages are said to be the proximate result of a breach, and are sometimes called 'loss of bargain' damages, because they reflect a failure on the part of the defendant to live up to the bargain it made, or a failure of the promised performance itself. Consequential damages, on the other hand, include those damages that, although not an invariable result of every breach of this sort, were reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach. These, too, must be proximately caused by the breach, and the difference is that they do not always follow a breach of this particular character." *Id.* (internal quotation marks and citation omitted).

Here Plaintiff's theory that they were harmed by the denial of SIPA protection as a result of WNB's purported failure to properly administer the custodial accounts is clearly not a claim for general damages but rather a claim for consequential damages.  This damage cannot be considered a general damage since the loss of SIPA protection does not flow naturally from WNB's failure to transfer the funds and its decision to maintain a comingled account. Instead this purported harm is clearly a claim for consequential damages. However, the loss of SIPA protection resulting from Madoff's Ponzi scheme was clearly not a reasonably foreseeable or contemplated harm by the parties at the

time the custodial agreements were executed.  Consequently, Plaintiffs may not recover for a loss "that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."  Restatement (Second), Contracts § 351.   Even assuming that Plaintiffs' SIPA theory was persuasive, Plaintiffs would still not have established that they suffered damages proximately caused by WNB's alleged failure to administer the custodial accounts pursuant to the terms of the agreement.

Moreover, this Court cannot discern any damages that would flow from WNB's conduct of commingling the funds that would not be speculative.  To the extent that it can be said that if WNB had maintained individual accounts and transferred all funds deposited to BLMIS immediately then BLMIS would have had to meet the redemption requests made by Plaintiffs in lieu of WNB's use of other investor funds to meet those requests in the comingled clearing account.  It is possible that if BLMIS had to service those additional requests that the Ponzi scheme would have come to light sooner.  However any such theorizing in this vain would be conjectural and speculative.  "It is hornbook law that to be entitled to damages in contract a plaintiff must establish a causal relation between the breach and the damages flowing from that breach.  Such causal relation must be more than surmise or conjecture, inasmuch as a trier is concerned not with possibilities but with probabilities. Where ... the damages claimed are remote from the breach complained of and the causal connection is wholly conjectural, there can be no recovery."  *Calig v. Schrank,* 179 Conn. 283, 286, 426 A.2d 274 (1976); *Bridgeport Harbour Place I, LLC v. Ganim*, No.X06CV040184523S, 2008 WL

**366550, at \*3 (Conn. Super Ct. Jan. 25, 2008) ("proximate cause cannot be premised on such indefinite assumptions or contingencies that the causal relationship at issue is rendered remote and speculative").**

**Plaintiffs have failed to submit any evidence that the purported failure to administer the custodial account pursuant to the terms of the custodial agreement was the proximate cause of any damages. "Although the issue of causation generally is a question reserved for the trier of fact ... the issue becomes one of law when the mind of a fair and reasonable person could reach only one conclusion, and summary judgment may be granted based on a failure to establish causation." *Abrahams v. Young and Rubicam, Inc.,* 240 Conn. 300, 307 (1997) (internal quotation marks and citation omitted).   Here no fair or reasonable person could conclude that Plaintiffs suffered any non-speculative damages proximately caused by WNB's alleged failure to administer the custodial accounts pursuant to the terms of the agreement.  Plaintiff has presented no evidence that there was any amount of money in the BLMIS account maintained by the Plaintiff's at any particular time.  The very nature of a Ponzi scheme is to pay redemptions to one customer from the deposits made by another. Thus, Plaintiffs would have to have presented facts to establish that Madoff would not have used one Participant's funds to meet another Participant's redemption request had the funds been transmitted to BLMIS rather than retained by WNB. On this ground, the Court grants summary judgment in favor of WNB on Plaintiffs' breach of contract claim on the basis of the failure to appropriately administer the custodial accounts.**

**22**

2.      **Failure to return Plaintiffs' contributions as required by Paragraph 7**

Plaintiffs argue that WNB breached the agreement by refusing to comply with Paragraph 7 of the agreement which provides that the "Custodian Agreement may be terminated by either party upon ninety (90) days prior written notice.  Upon termination, all cash, cash equivalents and other property held hereunder shall be delivered as soon as practicable to the Principal." (Whatley Decl. Ex. 49.)  Plaintiffs argue that pursuant to Paragraph 7 WNB is required to return their contributions which it has failed to do.  Plaintiffs further contend that the custodial agreements have been terminated although WNB claims there is no evidence of the terminations.  WNB explains that to the extent that Plaintiffs are referring to the small sum remaining in the clearing account, that it has put those funds in an interest bearing account pending resolution of litigation.  To the extent Plaintiffs are referring to the funds held in the BLMIS omnibus account, WNB argues that it is not in breach because of Madoff's perpetration of the Ponzi scheme in which he stole those funds and because BLMIS is now in bankruptcy.  WNB argues that in light of BLMIS's bankruptcy and the unprecedented theft perpetrated by Madoff it was clearly not practicable for WNB to return those funds under the terms of Paragraph 7.  (Dkt. #290 p. 22-23.)  This Court agrees that a reasonable juror would conclude that it was not "practicable" to return the contributions held in the BLMIS account that were admittedly stolen by Madoff and that it was prudent for WNB to set aside the funds in the clearing account pending resolution of this action.  Consequently, no reasonable juror would conclude that WNB breached its obligations in Paragraph 7.

Moreover, Paragraph 7 could be interpreted to mean that WNB had the obligation to request from BLMIS the assets in the omnibus account in order to deliver the "cash, cash equivalent and other property held" in line with Paragraph 2 which provides that the WNB "will also follow such reasonable written directions which the Principal may deliver to the Bank . . . including to request that BLMIS return assets of the Principal to the Bank and for the Bank to remit cash or cash equivalents to the Principal."  (Whatley Decl. Ex. 49.)  "[I]n construing contracts, we give effect to all the language included therein, as the law of contract interpretation ... militates against interpreting a contract in a way that renders a provision superfluous."  *Connecticut National Bank v. Rehab Associates,* 300 Conn. 314, 322 (2011) (internal quotation marks and citation omitted).  Paragraph 7 when read in conjunction with Paragraph 2 suggests that upon termination WNB only had the obligation to request BLMIS to return the Plaintiffs' assets and then deliver the assets BLMIS returned on to Plaintiffs. WNB has indicated that it has filed a claim in the BLMIS bankruptcy noting that the Class members' proportionate share of the Madoff investment account is pending a final plan of distribution in the BLMIS bankruptcy.  (WNB's Opp. to Pl. Summary Judgment, p. 22).  Accordingly, WNB has fulfilled its obligation under Paragraph 7 to effectuate the return of assets as practicable under the terms of the agreement.  Consequently, the Court grants summary judgment in favor of WNB on Plaintiffs' breach of contract claim on the basis that WNB breached its obligations under Paragraph 7.[1]

---

[1] The Court notes that WNB has also argued that Plaintiffs are not entitled to

3.      Calculation of fees based on "assets"

Third, Plaintiffs argue that they are entitled to summary judgment on their breach of contract claim because WNB relied on fabricated account statements from BLMIS.  As a result, they claim, WNB breached the custodial agreements by improperly charging fees based on the value of fictitious assets and providing inaccurate records and statements.  WNB again argues that summary judgment in its favor is appropriate because the contract unambiguously permitted it to manage the custodial relationship as it did.

a.      Breach

The custodial agreement provides that WNB and PSCC will receive fees based on the assets held under the custodial agreement.  As to PSCC, the agreement provides for fees based on "average assets (determined on an annual basis) held by [WNB] under this Custodian Agreement" (Whatley Decl. Ex. 49, at 2), or to "assets at the time of billing held by [WNB] under this Custodian Agreement" (*id.* at 3).  As to WNB, it provides for fees based on "average assets held hereunder (determined on an annual basis)."  (*Id.* at 2.)

The Plaintiffs argue that, when the contract uses the term "assets," it means *actual* assets held.  (*See* Pl.'s Mot. for Partial Summ. J. at 24-25.)  WNB

---

prejudgment interest noting that the question of whether to grant such interest is an equitable determination and a matter lying within the discretion of the trial court.  (WNB's Opp. to Pl. Summary Judgment, p. 23.)  To the extent that this argument is predicated only with respect to Plaintiffs' claim that WNB breached its obligations under Paragraph 7, the Court need not address it in light of the grant of summary judgment to WNB on that claim.  To the extent that this argument is more broadly asserted, the Court finds the argument to be premature at this juncture and can be reasserted after trial has concluded.

argues that the term "assets" instead means the assets as *reported* by BLMIS. (*See* WNB's Opp. to Pl.'s Mot. for Summ. J. at 35-36.)  The remaining contract language does not assist in resolving this issue.[5]  (*See generally* Whatley Decl. Ex. 49.)  This Court therefore concludes that the contract term "assets" is susceptible of both readings and is therefore ambiguous.

WNB, citing to *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787 (S.D.N.Y. 2011), argues that the contract term "assets" unambiguously means the value of assets reported by BLMIS.  (*See* WNB's Opp. to Pl.'s Mot. for Summ. J. at 35-36.)  The *Anwar* court, on a motion to dismiss claims similar to those the Plaintiffs brought here, held that a contract which called for an intermediary to assess fees based on "month-end NAV of the Shares [of a hedge fund invested in BLMIS]" unambiguously permitted the intermediary to assess fees based on NAV

---

[5] The absence of any specific contract language on this point distinguishes this matter from *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226 (D. Colo. 2011), and *Hines v. Fiserv, Inc.*, No. 8:08-cv-2569-T-30AEP, 2010 WL 1249838 (M.D. Fla. Mar. 25, 2010).  The plaintiffs in *Mandelbaum* and *Hines* also brought claims arising out of their losses from the collapse of BLMIS against Fiserv, Inc., an intermediary like WNB, but both plaintiffs had agreed to contracts which expressly stated that Fiserv, Inc. (or one of its subsidiaries), "does not conduct appraisals of investments and does not seek to verify the prices or values provided to it."  *Mandelbaum*, 787 F. Supp. 2d at 1251; *Hines*, 2010 WL 1249838, at *5.  This express provision was fatal to the plaintiffs' breach of contract claims because the relevant contract disclaimed any obligation to audit, appraise, or verify asset values as reported by BLMIS.  *Mandelbaum*, 787 F. Supp. 2d at 1251; *Hines*, 2010 WL 1249838, at *5.  No similar contract language exists here.  (*See generally* Whatley Decl. Ex. 49.)  Although WNB urges this Court to read similar language into the custodial agreement here, this Court declines to do so.

26

as reported to it.  831 F. Supp. 2d at 794-95.  The reasoning in this decision does not resolve the matter of contract interpretation here.[6]

In *Anwar*, the relationship between the intermediary bank defendant, BLMIS, and the plaintiff seeking to recover fees on a breach of contract theory was meaningfully different.  The intermediary bank defendant had custody of the plaintiff's investment in a hedge fund which, in turn, invested with BLMIS.  *Id.* at 795.  The court interpreted NAV, net asset value, as a term of art which, when concerning the assets of a hedge fund, means a value calculated and promulgated by the hedge fund.  *Id.*  Using this interpretation, the court concluded that the plaintiffs could not reasonably have expected that the intermediary bank would calculate its fees based on any figure other than the NAV reported by the hedge fund.  *Id.* at 795-96.

Here, WNB's position is not equivalent to that of the intermediary in *Anwar*. Unlike the intermediary in *Anwar*, WNB had the responsibility to calculate the NAV of a basket of investments which included BLMIS shares held by WNB in the BLMIS omnibus account as well as other assets, namely the cash accounts at WNB.  831 F. Supp. 2d at 795; (Pl.'s L.R. 56(a)(1) Stmt. ¶ 31; WNB's L.R. 56(a)(2) Stmt. ¶ 31.)  And unlike the intermediary in *Anwar*, WNB contracted to base its fees on "assets," not the "NAV of the Shares [held by WNB as custodian]." *Compare* 831 F. Supp. 2d at 794 *with* (Whatley Decl. Ex. 49, at 2). Here the

---

[6] Even if *Anwar* were indistinguishable from this matter, it would not be binding authority upon this Court.

Participants contracted with PSCC to provide services with respect to their investments with BLMIS. (Custodian Agreement, Paragraph 4}

Moreover, WNB's position is analogous to that of the hedge fund in *Anwar*. Like the hedge fund in *Anwar*, WNB held multiple investments in which the Plaintiffs had proportionate interests.  831 F. Supp. 2d at 795; (Pl.'s L.R. 56(a)(1) Stmt. ¶ 31; WNB's L.R. 56(a)(2) Stmt. ¶ 31.)  Like the hedge fund in *Anwar*, WNB calculated the NAV of these investments regularly.  *See* 831 F. Supp. 2d at 795; (Clark-Weintraub Decl. Ex. 27, at 38:11-17, 39:24-40.8.)  Accordingly, because *Anwar* resolved claims against an intermediary which did not calculate its own NAV and contractually based its fees on the value of shares in the hedge fund, and because *Anwar* did not address claims against the hedge fund itself, *Anwar* does not resolve the contract interpretation dispute here.  The terms of the custodial agreements therefore do not conclusively resolve whether the term "assets" means actual assets or reported assets.

In the absence of a clear, unambiguous meaning for the term "assets," this Court could nonetheless conclude that summary judgment is proper if sufficient extrinsic evidence exists to demonstrate the parties' intent conclusively.  *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.* (*Compagnie Financiere*), 232 F.3d 153, 157-58 (2d Cir. 2000); *Murtha v. City of Hartford*, 303 Conn. 1, 8, 35 A.3d 177 (2011) ("When the language of a contract is ambiguous, . . . the determination of the parties' intent is a question of fact.").  This Court concludes that the evidence is not so conclusive as to warrant summary judgment for either party.   Evidence that WNB did take

some steps to verify the BLMIS statements exists in the record.  (Clark-Weintraub Decl. Ex. 28, at 256:9-259:6 (discussing verification of stock prices).)  Additional evidence in the record indicates that WNB personnel both recognized that they some obligation to verify additional information provided in the BLMIS monthly statements and attempted to take additional steps to do so.  (*Id.* at 260:13-265:6 (discussing attempt to verify option positions, including meeting where WNB personnel discussed that "we have to come up with someone who can provide the [option] verification").  This evidence tends to suggest that WNB contemporaneously interpreted its contractual obligations to include paying fees based only on actual assets, not reported assets.

In addition, certain evidence in the record suggests that WNB reserved the right to audit the investments in BLMIS, but apparently never did so.[7]  (Whatley Decl. Ex. 14, at 15.)  Because it did not do so, WNB's federal bank regulator, the Office of the Comptroller of the Currency ("OCC"), concluded that WNB's management lacked sufficient controls over its relationship with BLMIS.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 30.)  This evidence suggests that, in addition to WNB, the OCC interpreted WNB's obligations under the contract as extending to auditing or verifying BLMIS' reported asset values to some extent.  Viewed in the light most favorable to the Plaintiffs, this evidence creates triable issues with

---

[7] This evidence appears in an early document Silverman prepared outlining the nature of the custodial arrangement which WNB proposed to take over from HUB. Other evidence in the record suggests that the relevant contract between WNB and BLMIS says nothing about a right to an audit.  (Whatley Decl. Ex. 21, at 4-9.) This factual discrepancy is yet another disputed material fact.

respect to whether WNB had a duty to ascertain the actual existence and value of assets held by BLMIS and whether the contract term "assets" means actual assets such that summary judgment is not proper for WNB on this claim.

WNB counters with evidence that no relevant federal agency ever directed or mandated that WNB audit or verify BLMIS' reported asset values and evidence that none of BLMIS' other investors ever conducted such a verification or audit. (WNB's L.R. 56(a)(1) Stmt. ¶¶ 44-45.)  This argument is unavailing.  The basis of the criticism was not a regulatory or statutory requirement which the OCC was bound to enforce, but rather a contractual provision.  WNB cites no authority for the OCC's authority to direct it to perform a contractual provision. Thus the legal significance of its failure to do so has not been established.  On the contrary, the OCC interpretation is merely one possible interpretation of the contract.  Viewing the evidence in the light most favorable to WNB,  this evidence amplifies the existence of a triable issue with respect to whether the contract term "assets" means reported assets such that summary judgment is not proper for the Plaintiffs on this claim.

Whether viewed in the light most favorable to the Plaintiffs or WNB, a genuine issue of material fact exists based on the extrinsic evidence of the meaning of the ambiguous contract term "assets."  Sufficient triable issues therefore exist to preclude summary judgment for either party on this claim.

> b. Causation

WNB further argues that, even if it breached the custodial agreements by paying BLMIS fees based on reported assets instead of actual assets, the Plaintiffs cannot succeed on their claim because they cannot show that this breach caused them any damages.  (WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 36-37.)  WNB claims that the Plaintiffs cannot show that any breach proximately caused them damages because the Plaintiffs only "paid" fees in the sense that WNB sold the Plaintiffs' worthless BLMIS shares in proportion to the fees owed.  (*Id.* at 36.)

"[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."  *Gurguis*, 93 Conn. App. at 168.  WNB concedes, as it must, that "[p]roximate cause is ordinarily a question of fact."  *Id.*  This Court concludes that it is such a question here too and that summary judgment is not proper on this basis.

It is undisputed that WNB actually received substantial fee income in connection with performing custodial services for the Plaintiffs.[8] (WNB's L.R. 56(a)(1) Stmt. ¶ 50.)  It is equally undisputed that the Plaintiffs contributed money to their investment accounts with the reasonable expectation that it would appreciate in value and not be stolen.  (WNB's L.R. 56(a)(1) Stmt. ¶¶ 1-5.)  This Court has already concluded that the Plaintiffs have raised a triable issue as to

---

[8] **WNB disputes whether the $2.8 million in fees Plaintiffs claim includes fees paid by account holders who closed their accounts before December 11, 2008.  To the extent that this is accurate, Plaintiffs cannot recover fees paid by such account holders in this action because they are not class members.**

whether WNB rightfully received as much in fees as it did.  If WNB wrongfully received fees, then the money rightfully belongs to someone else, and WNB's improper fees would constitute a substantial factor in their loss to that person.  The Plaintiffs' evidence creates a triable issue as to the source of the fees paid to WNB as well as whether at least some of the money WNB received as fees is attributable to the Plaintiffs' contributions to their accounts.  (*See* WNB's L.R. 56(a)(1) Stmt. ¶¶ 1-5, 50.)   Moreover, had WNB conducted some audit or verification of BLMIS' reported asset values in order to verify its fees and discovered some discrepancy or indication of fraud, then WNB would not have collected the amount of fees that it did.  Consequently, Plaintiffs have presented a theory of damages in connection with this claim, when viewed in the light most favorable to them, evince proximate causation.  Accordingly, the evidence shows a genuine factual dispute about whether and to what extent WNB's improper fees rightfully belong to the Plaintiffs.  Summary judgment is not warranted in WNB's favor on the issue of proximate causation.

### 4.    WNB's failure to maintain adequate records and statements

Lastly, Plaintiffs argue they are entitled to summary judgment because WNB did not maintain adequate records of Plaintiffs' investment and that under the custodial agreement it was required to do more than just send out annual statements which parroted BLMIS's reported values.  The custodial agreement provides that WNB "shall maintain adequate records indicating the ownership by [the Plaintiffs] of investments with BLMIS and held by [WNB] as custodian for [the

32

Plaintiffs]" and "shall render at least annually statements reflecting the property held by it as custodian hereunder."   (Whatley Decl. Ex. 49, at 2.)

As with the propriety of WNB's fees based on the contractual term "assets," the parties disagree about the proper interpretation of the terms "adequate records" and "statements reflecting the property held . . . as custodian."  The Plaintiffs argue that adequate records and statements reflecting the property in which they had an interest would have shown that the Plaintiffs owned nothing because BLMIS was a fraud.  (*See* Pl.'s Mot. for Partial Summ. J. at 21-24)  WNB argues that these terms instead mean records and statements based on the information reported by BLMIS.  (*See* WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 21-25.)  Again, the remaining contract language does not assist in resolving this issue.[9]  (*See generally* Whatley Decl. Ex. 49.)

This Court therefore concludes that the contract terms "adequate records" and "statements reflecting the property held . . . as custodian" are susceptible of both readings and are therefore ambiguous.  Because insufficient extrinsic

---

[9] **Again, no specific language disclaiming any responsibility to audit or verify the statements WNB received from BLMIS appears in the custodial agreements.  (*See generally* Whatley Decl. Ex. 49.)  *Mandelbaum* and *Hines* are again distinguishable on this basis, *see Mandelbaum*, 787 F. Supp. 2d at 1251; *Hines*, 2010 WL 1249838, at \*5, and the Court declines to read similar disclaimer language into the custodial agreement here, *see* note 5, *supra*.  To the extent that WNB relies upon the custodial agreement's disclaimer of any "authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS," this Court rejects the argument because the contract term addresses itself to WNB's role in BLMIS' discretionary investment decisions, not whether WNB had an obligation to take at least some steps to verify that BLMIS was making discretionary investments at all.  (*See* Whatley Decl. Ex. 49., at 1.)**

evidence exists to demonstrate conclusively the parties' intent with respect to these ambiguous contract terms, summary judgment is not warranted for either party.  *See Compagnie Financiere*, 232 F.3d at 157-58; *Murtha*, 303 Conn. at 8.

Again, evidence that WNB did take some steps to verify the BLMIS statements (Clark-Weintraub Decl. Ex. 28, at 256:9-259:6 (discussing verification of stock prices)), as well as evidence that WNB personnel both recognized that they some obligation to verify additional information provided in the BLMIS monthly statements and attempted to take additional steps to do so (*id.* at 260:13-265:6 (discussing attempt to verify option positions, including meeting where WNB personnel discussed that "we have to come up with someone who can provide the [option] verification"), exists in the record.  Additional evidence also suggests that WNB could have audited the investments in BLMIS, did not do so, and lacked proper internal controls as a result.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 5, 30.)  Viewed in the light most favorable to the Plaintiffs, this evidence creates a triable issue with respect to whether the contract terms "adequate records" and "statements reflecting the property held . . . as custodian" mean records and statements which reflected that the Plaintiffs' BLMIS investments did not exist.[10]  Summary judgment is not proper for WNB on this claim.

_____

[10] **To the extent that the Plaintiffs rely on 26 U.S.C. § 408 (2006) or WNB's obligation to provide Form 5498's to the Internal Revenue Service to establish that the contract required WNB to provide records and statements which reflected that the Plaintiffs' BLMIS investments did not exist, this Court concludes that neither imposes any duties on WNB beyond those in the custodial agreements.  The custodial agreement therefore determines the scope of WNB's responsibility to ensure the accuracy of information reported to the IRS and**

WNB argues, not without persuasive force, that the Plaintiffs' proffered interpretation is unreasonable because WNB would incur liability for failing to uncover the Madoff Ponzi scheme before law enforcement and the rest of BLMIS' investors.  (*See* WNB's L.R. 56(a)(1) Stmt. ¶¶ 44-45.)  WNB also again relies on evidence that relevant authorities never directed or mandated that WNB audit or verify BLMIS' periodic statements.  (*Id.*)  Viewed in the light most favorable to WNB, this evidence creates a triable issue with respect to whether the records and statements which WNB provided complied with the custodial agreement's records and statements terms.  Summary judgment is not proper for the Plaintiffs on this claim.  As discussed above, Plaintiffs have presented facts which indicate that WNB's failure to audit proximately caused WNB to collect fees that were inflated.

Whether viewed in the light most favorable to the Plaintiffs or WNB, a genuine issue of material fact exists based on the extrinsic evidence of the meaning of the ambiguous contract terms "adequate records" and "statements reflecting the property held . . . as custodian."  Sufficient triable issues therefore exist to preclude summary judgment for either party on this claim.

B.      Breach of fiduciary duty.

WNB argues that its undisputed status as custodian of the Plaintiffs' investments, not as an investment advisor, necessarily means that the WNB had

---

whether WNB could permissibly rely solely on information provided by BLMIS in fulfilling its obligations under the Internal Revenue Code.

no fiduciary duty to the Plaintiffs at all.  This Court disagrees and concludes that
the record contains triable factual issues with respect to whether WNB bore any
fiduciary duties to the Plaintiffs and whether WNB breached any such duties.
Accordingly, summary judgment for WNB on this claim is not warranted.

"[A] fiduciary or confidential relationship is characterized by a unique
degree of trust and confidence between the parties, one of whom has superior
knowledge, skill or expertise and is under a duty to represent the interests of the
other."  *Sherwood v. Danbury Hosp.*, 278 Conn. 163, 195, 896 A.2d 777 (2006)
(quoting *Biller Assocs. v. Peterken*, 269 Conn. 716, 723, 849 A.2d 847 (2004)).
"Although [the Connecticut Supreme Court has] not *expressly* limited the
application of these traditional principles of fiduciary duty to cases involving only
fraud, self-dealing or conflict of interest, the cases in which we have invoked
them have involved such deviations."  *Id.* (quoting *Murphy v. Wakelee*, 247 Conn.
396, 400, 721 A.2d 1181 (1998)) (emphasis in original).  "In the seminal cases in
which [the Connecticut Supreme Court] has recognized the existence of a
fiduciary relationship, the fiduciary was either in a dominant position, thereby
creating a relationship of dependency, or was under a specific duty to act for the
benefit of another. . . .  In the cases in which this court has, as a matter of law,
refused to recognize a fiduciary relationship, the parties were either dealing at
arm's length, thereby lacking a relationship of dominance and dependence, or the
parties were not engaged in a relationship of special trust and confidence."  *Biller
Associates v. Peterken*, 269 Conn. 716, 723-24, 849 A.2d 847 (2004) (internal
quotations omitted).  The *legal* question of whether a fiduciary *duty* exists

therefore depends on the resolution of the *factual* question of whether a fiduciary

or confidential *relationship* exists.  *See id.*; *see also Albuquerque v. Albuquerque*,

42 Conn. App. 284, 287, 679 A.2d 962 (1996).

        a.     **Calculation of fees**

      Genuine factual issues exist as to whether a fiduciary relationship existed

between WNB and the Plaintiffs with respect to the calculation of fees.  It is

undisputed that WNB calculated the basis for its own fees, the NAV of the

custodial accounts.  (Clark-Weintraub Decl. Ex. 27, at 38:11-17, 39:24-40:8.)  It did

so based on information which was unavailable to the Plaintiffs: the transaction

reports which came directly from WNB and the cash balance in the custodial

services accounts.  (*Id.*; WNB's Supp. L.R. 56(a)(1) Stmt. Ex. R, at 316:13-317:3;

Clark-Weintraub Decl. Ex. 28, at 214:9-20.)  Internal WNB documents raised the

possibility that, based on this discrepancy, WNB might owe the Plaintiffs a

fiduciary duty with respect to the calculation of WNB's and PSCC's fees.

(Whatley Decl. Ex. 24, at 2.)  Viewed in the light most favorable to the Plaintiffs,

this evidence creates a triable issue with respect to whether this arrangement had

the requisite trust, knowledge disparity, and duty to represent the Plaintiff's

interests with respect to the calculation of the NAV of the Plaintiffs' investment

accounts to give rise to a fiduciary duty.[11]

---

[11] **WNB argues, and this Court agrees, that the custodial agreement
unambiguously provides that "[WNB] has no authority or ability to direct or
oversee in any manner the discretionary investments made by BLMIS; . . . [WNB]
is acting solely in a ministerial capacity; . . . [and WNB] assumes no responsibility
for the investment performance of BLMIS."  (Whatley Decl. Ex. 49, at 1.)  WNB**

### b.   Investment discretion

Genuine factual issues also exist about whether WNB exercised sufficient discretion over the Plaintiffs' proportionate investments in the BLMIS omnibus account and the custodial clearing accounts such that a fiduciary relationship existed.  WNB, without consulting the Plaintiffs, made the determination to liquidate investments in the BLMIS account, thus altering the allocation of Plaintiffs' proportionate investments between the clearing account and the omnibus account. (Clark-Weintraub Decl. Ex. 31, at 47:17-48:13.)  In addition, WNB determined about when to transfer money to BLMIS, without instructions from the Plaintiffs or BLMIS, in order to satisfy anticipated future cash needs.  (*Id.* at 47:17-48:13, 138:3-139:4; *see also* Whatley Decl. Ex. 3, at 169:15-25.)  When the OCC discovered these practices, it concluded that "[WNB's role] could be construed as evolving beyond being ministerial in nature."  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 30.)  Viewed in the light most favorable to the Plaintiffs, this evidence raises a genuine factual dispute as to whether WNB exercised sufficient discretion, independent of the Plaintiffs' instructions, over the Plaintiffs' proportionate investments in the BLMIS omnibus account and the clearing accounts so as to put the parties in a fiduciary relationship.

---

therefore bore no fiduciary duty arising out of the Plaintiffs' selection of BLMIS as an investment.  But the contract also created the arrangement where WNB would calculate the NAV of the Plaintiffs' investments based on information unavailable to the Plaintiffs.  (*See id.*)  Without any language specifically disclaiming a fiduciary relationship based on this aspect of the arrangement, the custodial agreement does not preclude the existence of such a relationship and a resulting duty of loyalty to the Plaintiffs with respect to other elements of the arrangement.

### c.     Breach

Finally, genuine factual issues exist as to whether WNB breached any such fiduciary duties.  WNB's federal regulator advised, if not mandated, that "[c]ustodians should establish strong risk-based internal controls to protect assets held off-premises" and that "[i]ndependent personnel should reconcile the depository's position report to the custodian's accounting system each month."  (Whatley Decl. Ex. 56, at 16.)  Evidence in the record suggests that WNB interpreted its responsibilities similarly.  (Clark-Weintraub Decl. Ex. 28, at 256:9-259:6 (discussing verification of stock prices); *id.* at 260:13-265:6 (discussing attempt to verify option positions, including meeting where WNB personnel discussed that "we have to come up with someone who can provide the [option] verification").  Other evidence in the record indicates that WNB's failure to discharge these responsibilities meant that it "did not appropriately implement effective controls."  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 30.)  The evidence also shows that the Plaintiffs did not receive the detailed statements from BLMIS that WNB received, and one can reasonably infer from this evidence that the Plaintiffs, because they did not have accounts at BLMIS, also lacked the ability to audit or investigate BLMIS.  (Clark-Weintraub Decl. Ex. 27, at 38:11-17, 39:24-40:8; WNB's Supp. L.R. 56(a)(1) Stmt. Ex. R, at 316:13-317:3; Clark-Weintraub Decl. Ex. 28, at 214:9-20.)  Evidence in the summary judgment record also suggests that WNB adopted certain policies which systematically overstated the NAV of the custodial accounts.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 30.)

Viewed in the light most favorable to the Plaintiffs, this evidence raises genuine issues of material fact about whether WNB breached any fiduciary duty to the Plaintiffs.  If the Plaintiffs can show at trial that WNB had the ability to audit or verify the BLMIS assets and failed to do so, a reasonable juror could conclude that such a failure breached a fiduciary obligation to represent the Plaintiffs' interest when the Plaintiffs, without access to the BLMIS statements or the ability to audit or investigate BLMIS, could not do so themselves.  Similarly, if the Plaintiffs can show at trial that WNB adopted policies and practices which systematically overstated the NAV of the custodial accounts and, as a result, its own fees, then a reasonable juror could find the requisite self-dealing and conflict of interest to sustain liability for breach of fiduciary duty.  Plaintiffs' breach of fiduciary duty claim is therefore likewise premised on WNB's failure to audit BLMIS as several of their breach of contract claims.   Again, Plaintiffs have presented facts upon which a reasonable juror could conclude that they suffered damages proximately caused by the failure to audit.  As discussed above, if WNB had audited and discovered some discrepancy or indication of fraud, then Plaintiffs would have either stopped investing in BLMIS or invested less.  Further, an audit could have revealed that the reported asserts were overstated and therefore reduced the amount of fees WNB charged.  This record therefore contains triable factual issues with respect to whether WNB bore any fiduciary duties to the Plaintiffs and whether WNB breached any such duties.  Summary judgment in WNB's favor on this claim is not proper.

C.    Negligence.

40

WNB argues that it is entitled to summary judgment on the Plaintiffs' negligence claim because (1) it owed the Plaintiffs no duty to monitor, verify, or audit their investments with BLMIS, and (2) any breach of WNB's duty could not have caused the Plaintiffs' damages.  (WNB's Mem. in Support of Mot. for Summ. J. at 34-38.)  This Court concludes that the record contains triable factual issues with respect to what the relevant standard of care is in this matter and whether any breach by WNB caused the Plaintiffs' damages.  Summary judgment on this claim is not proper.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  *Pelletier v. Sordoni / Skanska Constr. Co.*, 286 Conn. 563, 593, 945 A.2d 388 (2008).  Unlike breach of fiduciary duty claims, negligence claims implicate only a duty of care, rather than a duty of loyalty and honesty.  *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56-57, 717 A.2d 724 (1998).

### 1.    Duty / Standard of care

Although WNB argues that it had no legal duty to monitor, verify, or audit the Plaintiffs' investments with BLMIS, it cannot plausibly assert that it owed the Plaintiffs no duty whatsoever to act with reasonable care under the circumstances.  *See Collins v. City Nat. Bank & Trust Co. of Danbury*, 131 Conn. 167, 38 A.2d 582 (1944).  This Court therefore construes WNB's argument as asserting that the standard of care in these circumstances did not extend to monitoring, verifying, or auditing the Plaintiffs' investments with BLMIS.

41

Evidence that the proper standard of care did so extend exists in the record.  Relevant OCC guidance states that "[c]ustodians should establish strong risk-based internal controls to protect assets held off-premises" (Whatley Decl. Ex. 56, at 16), and the OCC specifically remarked that WNB needed to "implement effective controls" (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 30).  Again, evidence in the record suggests that WNB interpreted its responsibilities similarly.  (Clark-Weintraub Decl. Ex. 28, at 256:9-259:6 (discussing verification of stock prices); *id.* at 260:13-265:6 (discussing attempt to verify option positions, including meeting where WNB personnel discussed that "we have to come up with someone who can provide the [option] verification").  Viewed in the light most favorable to the Plaintiffs, a genuine issue of fact exists as to whether the standard of care in these circumstances included monitoring, verifying, or auditing the Plaintiffs' investments with BLMIS.

      2.    **Causation**

WNB invokes the well-established superseding cause rule to argue that Madoff's intentional fraudulent and criminal acts broke the chain of causation and relieve WNB, as a matter of law, from any liability for the Plaintiffs' damages even if it acted negligently.  WNB concedes, as it must, that "an intervening intentional or criminal act relieves a negligent defendant of liability, except where the harm caused by the intervening act is within the scope of risk created by the defendant's conduct *or* where the intervening act is reasonably foreseeable." *Medcalf v. Washington Heights Condo. Ass'n, Inc.*, 57 Conn. App. 12, 17, 747 A.2d 532, 536 (2000) (emphasis added).

Here, the record contains some evidence that fraud or misconduct on the part of a third-party partner is within the scope of risk of having inadequate controls or monitoring of the third-party's conduct. (*See* Whatley Decl. Ex. 67, at 1) (memorandum stating that OCC identified "[f]raudulent investment schemes" as a potential source of risk); *id.* Ex. 77, at 2 (contemporaneous handwritten notes indicating that "[f]raudulent investment schemes" posing potential risks included, as an example, a "Ponzie Scheme" [sic]). Evidence in the record also tends to show that WNB's relationship with BLMIS involved "significant risk." (App. to WNB's L.R. 56(a)(1) Stmt. Ex. 60, at 5, 30.)

Construing this evidence in the Plaintiffs' favor, a genuine issue of fact exists as to whether the intervening act of BLMIS' fraud fell within the scope of risk of any negligent conduct by WNB such that the fraud did not break the chain of causation between WNB's claimed negligence and the harm to the Plaintiffs. As noted above, Plaintiffs have presented facts when viewed in the light most favorable to them indicated that they suffered damages proximately caused by WNB's failure to audit. Summary judgment is therefore not proper on the Plaintiffs' professional negligence claim based on an inability to show proximate causation.[12]

D.    CUTPA.

---

[12] To the extent that WNB relies on evidence that no verification or monitoring program could have uncovered the BLMIS fraud, this Court concludes that the evidence in the record is inconclusive and that the issue is properly one for the jury. (*See* WNB's L.R. 56(a)(1) Stmt. ¶ 42; Pl.'s L.R. 56(a)(2) Stmt. ¶ 42.)

Plaintiff argues that WNB's operation of the custodial accounts offended public policy and thus violated CUPTA because it violated IRS tax and OCC banking regulations.  CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42–110(b).  It provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . ."  *Id.*  In analyzing whether a practice violates CUTPA, the Connecticut Supreme Court has adopted the following criteria, known as the "cigarette rule": (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise; (2) whether it is immoral, unethical, oppressive or unscrupulous, and (3) whether it causes substantial injury to consumers.  *Edmands v. CUNO, Inc.*, 277 Conn. 425, 450 n.16, 892 A.2d 938 (2006).  A practice may be unfair because of the degree to which it meets one criteria or because to a lesser extent it meets all three.  *Id.*  Banks are subject to CUTPA.  *Smithfield Assocs., LLC v. Tolland Bank*, 86 Conn. App. 14 (2004) ("The banking industry is governed by CUTPA.").  "Any person *who suffers any ascertainable loss of money or property,* real or personal, as a result of the use or employment of a method, act or practice prohibited by [§ ] 42–110b, may bring an action ... to recover actual damages."  *Ventres v. Goodspeed Airport, LLC,* 275 Conn. 105, 154–55 (2006).  "The ascertainable loss requirement is a threshold barrier [that] limits the class of persons who may bring a CUTPA action seeking

either actual damages or equitable relief.... Thus, to be entitled to any relief under CUTPA, a plaintiff must first prove that he has suffered an ascertainable loss due to a CUTPA violation." *Neighborhood Builders, Inc. v. Madison,* 294 Conn. 651, 656–57 (2010) (internal quotation marks and citation omitted). "An ascertainable loss is a loss that is capable of being discovered, observed or established. The term 'loss' necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment and injury.   To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.,* 287 Conn. 208, 217–18, (2008) (internal quotation marks and citations omitted).  But in order for a loss to be ascertainable it must be " measurable even though the precise amount of the loss is not known." *Id. "*A plaintiff also must prove that the ascertainable loss was caused by, or 'a result of,' the prohibited act.  *Id.* at 218. Conn. Gen. Stat. §42-110g(a) "'requires a showing that the prohibited act was the proximate cause of a harm to the plaintiff.... [P]roximate cause is [a]n actual cause that is a substantial factor in the resulting harm...The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act.'"  *Id.* (quoting *Abrahams v. Young & Rubicam, Inc.*, 240 Conn. 300, 306 (1997)).

### 1.    IRS Regulations

Plaintiff argues that WNB violated tax regulations when it comingled qualified plan and IRA assets in the clearing account used to pay distributions

and account fees of others and in its omnibus account at BLMIS.   Plaintiffs point
to two provisions in the Internal Revenue Code that they allege WNB purportedly
violated through the comingling of assets.  These provisions set forth the
requirements that a pension plan must meet to be a tax-preferred plan and the
requirements for a tax-preferred IRA.  First, Plaintiffs allege that WNB violated 26
U.S.C. § 401(a)(2) which provides the tax requirements for qualification of a trust
created and forming part of a stock bonus, pension or profit sharing plan
including the requirement that "if under the trust instrument it is impossible, at
any time prior to the satisfaction of all liabilities with respect to employees and
their beneficiaries under the trust, for any part of the corpus or income to be
(within the taxable year or thereafter) used for, or diverted to, purposes other than
for the exclusive benefit of his employees or their beneficiaries."  26 U.S.C. §
401(a)(2).  Second, Plaintiffs allege that WNB violated 26 U.S.C. § 408(a)(5) which
provides the tax requirements for individual retirement accounts including the
requirement that the "assets of the trust will not be commingled with other
property except in a common trust fund or common investment fund." 26 U.S.C. §
408(a)(5).  Plaintiffs also point out that WNB completed IRS form 5305-A for those
Plaintiffs who held individual retirement accounts which expressly reiterates
Section 408's requirement that no part of the custodial account may be
commingled with other property except in a common trust fund or common
investment fund.  (IRS Forms 5305-A and 6305-RA).

       WNB argues that its conduct was not immoral, unethical, oppressive or
unscrupulous conduct and that the there was no unavoidable and unmitigated

substantial injury.  WNB further contends that Plaintiffs cannot prove that WNB's

conduct as opposed to Madoff's conduct caused their alleged injuries.   Although

not expressly discussed in such terms, it appears that WNB is contending that

Plaintiffs have failed to demonstrate they suffered an ascertainable loss.  This

Court agrees that Plaintiffs have failed to submit any evidence of ascertainable

loss occasioned by WNB's purported violations of the IRS regulations.

> The Connecticut Supreme Court has explained that:
>
> It is axiomatic that a claimant seeking relief under CUTPA bears the burden
> of proving, with reasonable certainty, those ascertainable losses sustained
> as a result of the unfair practice.  It is true that proof may be inferred from
> the circumstances of the case.  The test of the sufficiency of proof by
> circumstantial evidence however is whether rational minds could
> reasonably and logically draw the inference …The proof need not be so
> conclusive that it precludes every other hypothesis.  It is sufficient if the
> proof produces in the mind of the trier a reasonable belief that it is more
> probable than otherwise that the fact to be inferred is true.  Although the
> elements of a cause of action may be established on the basis of
> inferences drawn from circumstantial evidence; such inferences however
> must be reasonable and logical, and the conclusions based on them must
> not be the result of speculation and conjecture.   An inference must have
> some definite basis in the facts.

*Service Road Corp. v. Quinn*, 241 Conn. 630, 647 (1997) (internal quotation marks,

citations and brackets omitted).

Here, assuming that the alleged violations of these regulations could

constitute an unfair business practice under CUTPA, Plaintiffs point to no

evidence that the violation of these regulations caused them any quantifiable

loss.  For example, Plaintiffs have not submitted evidence that they suffered

negative tax consequences stemming from the alleged violations of the Internal

Revenue Code.  Further as discussed above in connection with Plaintiff's breach

of contract claim, Plaintiffs have failed to demonstrate what damages would flow from WNB's conduct of commingling funds instead of immediately transferring every deposit to BLMIS.  Consequently, the Court grants summary judgment in favor of WNB on Plaintiffs' CUTPA claim on the basis of WNB's alleged violation of IRS regulations.

### 1.    OCC Regulations

Plaintiffs further argue that WNB failed to comply with OCC banking regulations regarding the fiduciary activities of national banks administering a collective investment fund.  Plaintiffs allege that WNB violated 12 C.F.R. §9.18(b)(a)(1) which provides that a bank "establish and maintain each collective investment fund in accordance with a written plan (Plan) approved by a resolution of the bank's board of directors or by a committee authorized by the board" available for public inspection . . . The Plan must contain appropriate provisions . . . regarding the manner in which the bank will operate the fund." *Id.*  In addition, the regulation provides that a Bank administering a collective investment fund "shall arrange for an audit of the collective investment fund by auditors responsible only to the board of directions of the bank" at least once during each 12-month period." *Id.*  §9.18(b)(a)(6).

WNB argues that Plaintiffs have no proof to support their allegations that BLMIS's omnibus account constituted a collective investment fund.  WNB again argues that its conduct was not immoral, unethical, oppressive or unscrupulous conduct and that the there was no unavoidable and unmitigated substantial

injury.   Lastly, WNB again contends that Plaintiffs cannot prove that WNB's conduct as opposed to Madoff's conduct caused their alleged injuries.

In viewing the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that WNB was administering a collective investment fund within the meaning of 12 C.F.R. §9.18.  Section 9.18(a) explains that in general "a national bank may invest assets that it holds as a fiduciary in the following collective investment funds" including a "fund consisting solely of assets of retirement, pension, profit sharing, stock bonus or other trusts that are exempt from Federal income tax" and that a "National bank may invest assets of retirement, pension, profit sharing, stock bonus, or other employee benefit trusts exempt from Federal income tax and that the bank holds in *any capacity (including agent),* in a collective investment fund established under this paragraph (a)(2) if the fund itself qualifies for exemption from Federal income tax."  12 C.F.R. §9.18(a)(2) (emphasis added).   Here, the omnibus account did consist of assets of retirement, pension, profit sharing, stock bonus or other trusts that are exempt from Federal income tax.  A reasonable juror therefore could conclude that the omnibus account was a collective investment fund.  Moreover, the regulations expressly provide that a national bank, such as WNB, may invest such assets that it holds in any capacity, including agent, in a collective investment fund such as the omnibus account.  Consequently, a reasonable juror could conclude based on the plain meaning of the language of the regulation that WNB administered a collective investment fund and thus was obligated to conduct an annual audit.  Therefore there are a triable issues of fact

as to whether WNB was administering a collective investment fund and whether 12 C.F.R. §9.18 applied to WNB.

Assuming that these OCC regulations did apply to WNB, a reasonable juror could conclude that the failure to audit was an unfair trade practice which offended the public policy embodied in the OCC's regulation as required to establish a CUTPA violation and that such failure was unethical.  Under CUTPA, courts have looked to such sources of public policy as statutes, administrative decision and regulations as well as caselaw.  *See* Madison Square Garden CT, LLC v. Connecticut Light and Power Co., No.CV030821767, 2006 WL 1075009, at *1 (Conn. Super. Ct. Mar. 31, 2006); *see also Tillquist v. Ford Motor Credit Co.*, 714 F.Supp. 607, 616 (D.Conn.1989) (finding CUTPA violation where defendant violated banking regulations promulgated under Connecticut Creditor's Collections Practices Act).  Since all three criteria do not need to be satisfied to support a finding of unfairness under CUTPA, this Court need not consider whether WNB's conduct in failing to comply with these regulations caused substantial injury to consumers as there are triable issues of fact as to whether WNB violated public policy and engaged in unethical conduct by failing to comply with these regulations which could establish a violation of CUTPA at trial.

In addition, a reasonable juror could conclude that Plaintiffs have demonstrated an ascertainable loss flowing from WNB's failure to audit.  Had WNB annually audited the omnibus account, a discrepancy or some indication of fraud could have been discovered which could have prompted investors to stop investing in BLMIS or invest less of their funds in BLMIS which is a loss capable

**50**

of being discovered and measured albeit the precise amount of loss is unknown. Further had WNB audited, it could have been discovered that the omnibus account actually contained no assets and therefore WNB would have not been entitled to the fees it was charging based on the value of the omnibus account. Consequently, the Plaintiffs have also demonstrated an ascertainable loss in connection with the fees it paid to WNB on the bases of the fictitious value of the omnibus account.   As there are triable issues of fact as to whether these OCC regulations applied to WNB, whether WNB's alleged violation of the regulations violated public policy, and whether Plaintiffs have established an ascertainable loss it would be improper to grant summary judgment on Plaintiff's CUTPA claim based on WNB's violation of OCC regulations.

> E.     Unjust enrichment and money had and received.

The Plaintiffs argue that they are entitled to summary judgment on their money had and received claim because there is no dispute that WNB's fees were based on a mistaken belief about the value of the assets in the BLMIS omnibus account.  (Pl.'s Mot. for Partial Summ. J. at 27-28.)  WNB argues that it is entitled to summary judgment on the same claims because the fees were not unjust and, even if they were, the Plaintiffs suffered no detriment from paying them.  (WNB's Mem. in Support of Mot. for Summ. J. at 43-45.)

"Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefitted, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs'

detriment."  *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 231

Conn. 276, 282–83, 649 A.2d 518 (1994).  "[A]n action for 'money had and

received,' . . . is the equivalent of the more modern action for unjust enrichment."

*Gold v. Rowland*, 296 Conn. 186, 202 n.15, 994 A.2d 106 (2010).

 "Unjust enrichment is a legal doctrine to be applied when no remedy is

available pursuant to a contract . . . Recovery is proper if the defendant was

benefited, the defendant did not pay for the benefit and the failure of payment

operated to the detriment of the plaintiff."  *Russell v. Russell,* 91 Conn.App. 619,

637, 882 A.2d 98, cert. denied, 276 Conn. 924, 888 A.2d 92 (2005) (Internal

quotation marks omitted.).   Therefore a "right of recovery under the doctrine of

unjust enrichment is essentially equitable, its basis being that in a given situation

it is contrary to equity and good conscience for one to *retain a benefit* which has

come to him at the expense of another."  *Gagne v. Vaccaro*, 255 Conn. 390, 408

(2001) (internal quotation marks and citations omitted).  "With no other test than

what, under a given set of circumstances, is just or unjust, equitable or

inequitable, conscionable or unconscionable, it becomes necessary in any case

where the benefit of the doctrine is claimed, to examine the circumstances and

the conduct of the parties and apply this standard . . . Unjust enrichment is a very

broad and flexible equitable doctrine that has as its basis the principle that it is

contrary to equity and good conscience for a defendant to retain a benefit that

has come to him at the expense of the plaintiff."  *Id.* at 408-09.

 Pursuant to the custodial agreement, the custodial services fee would be

calculated on the average value of the assets.  Here WNB admits in its Local Rule

56(a)(1) Statement that the omnibus account at BLMIS in WNB's name actually held no assets and had never held any assets. (*Id.* at 34.)  Therefore, it is undisputed that the average value of the assets in the account was zero during the entire time that WNB acted as custodian.  Moreover, it is undisputed that WNB calculated its fees based on the NAV of the reported value of the combined pool of asserts including the value BLMIS reported in its monthly statement to WNB. (WNB's L.R. 56(a)(1) Stmt. ¶ 50.)   It is further undisputed that WNB made some attempts to verify some of the information in the monthly statements BLMIS sent to WNB, but WNB neither comprehensively verified the BLMIS monthly statements nor audited BLMIS.  (Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 29, 32; WNB's L.R. 56(a)(2) Stmt. ¶¶ 29, 32.)  Based on these undisputed facts, a reasonable trier of fact would conclude that WNB was unjustly benefited by Plaintiffs' payment of custodial fees based on the false reported value of assets that BLMIS did nothing to truly verify.   If WNB had taken steps to verify the real value of the assets which was it admits was zero it would not have been entitled to any fees under the custodial agreement.  Consequently, WNB was unjustly enriched by Plaintiffs' payment of the custodial fees and it would be inequitable to permit WNB to retain the benefit of those fees at the expense of the Plaintiffs.  The Court therefore grants summary judgment in favor of Plaintiffs on its unjust enrichment claim with respect to the payment of custodial fees based on the falsified value of the assets in the BLMIS omnibus account.

    F.    WNB's limited liability arguments.

       1.    Damages

WNB, citing to Federal Rule of Civil Procedure 56(g), argues that this Court should limit the damages available to the Plaintiffs so as to exclude (1) money the Plaintiffs invested before WNB became custodian, and (2) fictitious profits reported by BLMIS.  (WNB's Mem. in Support of Mot. for Summ. J. at 45-52.)   This Court concludes that triable issues exist with respect to the availability of both categories of damages based on Plaintiffs' claims which are predicated on WNB's failure to audit.  Summary judgment excluding such damages from the jury's consideration is therefore not proper.

### a.    Investments before WNB became custodian

WNB argues that, as a matter of law, it cannot have proximately caused the loss of money the Plaintiffs contributed to their accounts prior to WNB becoming custodian of the accounts.  Again, "[p]roximate cause is ordinarily a question of fact."  *Gurguis*, 93 Conn. App. at 168.  This Court concludes that it is so here. WNB's argument relies on its assertion that nothing it could have done after assuming the custodian role could have recovered money which Madoff had already stolen.  (WNB's Mem. in Support of Mot. for Summ. J. at 46.)  This argument is inconsistent with the general nature of a Ponzi scheme in which the perpetrator funds redemptions to one customer with the deposits of another. This theory is also contradicted by the facts in this case in particular.  Evidence in the record indicates that WNB continued to withdraw money from BLMIS through at 2008, long after it became custodian (WNB's L.R. 56(a)(1) Stmt. ¶ 30), that the Plaintiffs continued to withdraw their investments from WNB through 2008 (*Id.*), and that WNB offered the Plaintiffs the opportunity to withdraw their

money from BLMIS after the Madoff fraud was revealed (Clark-Weintraub Decl. Ex.

55).  Viewed in the light most favorable to the Plaintiffs, this evidence creates a

triable issue about whether the Plaintiffs both could and would have withdrawn

some or all of their investments with BLMIS if WNB had attempted to audit or

verify BLMIS' assets, uncovered evidence of fraud or other suspicious activity,

and disclosed it to the Plaintiffs.  Summary judgment limiting the Plaintiffs' ability

to recover based on investments made prior to 1999 is not warranted in

connection with Plaintiff's claims which are predicated on WNB's failure to audit.

### b.    Fictitious profits

WNB argues that the Plaintiffs cannot recover lost profits damages

because such damages based on the fictitious profits reported by a Ponzi

scheme are not legally cognizable.  The Plaintiffs argue that they invested with

BLMIS with the expectation that their investments would appreciate; now that

their investments have no value, they seek to recover lost profits in the form of

lost investment income which they could reasonably anticipate had they invested

in a bona fide investment instead of a Ponzi scheme.  This Court concludes that

the Plaintiffs' theory of damages is legally permissible and that they may present

it to the jury at trial in connection with their claims which are predicated on

WNB's failure to audit.

In Connecticut, the default rule is that recovery of lost profits on a breach

of contract claim is permissible: "[u]nless they are too speculative and remote,

prospective profits are allowable as an element of damage whenever their loss

arises directly from and as a natural consequence of the breach." *West Haven Sound Development Corp. v. City of West Haven*, 207 Conn. 308, 317, 541 A.2d 858 (1988).  In addition, the Connecticut Supreme Court has endorsed a flexible approach to permit consideration of lost profits damages based on negligence and breach of fiduciary duty claims.  *See Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 67-68, 717 A.2d 724 (1998).[14]

In the context of SIPA liquidations and securities fraud claims, WNB is quite right that victims of Ponzi schemes or other fraud may not recover fictitious profits.  See, e.g., *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. Sec. &  Exch. Comm'n*, 467 F.3d 73, 84 (2d Cir. 2006) (Securities Act and Securities Exchange Act); *In re New Times Sec. Servs., Inc.*, (*New Times II*), 467 F.3d 125, 130 (2d Cir. 2006) (SIPA); *In re New Times Sec. Servs., Inc.* (*New Times I*), 371 F.3d 68, 87 (2d Cir. 2004) (SIPA); *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971) (Securities Exchange Act).  In adjudicating the liquidation of BLMIS under SIPA, the United States Bankruptcy Court for the Southern District of New York has reached the same conclusion.  *In re Bernard L. Madoff Investment Sec.*

---

[14] Permitting the Plaintiffs to present their theory of damages to the jury also comports with permissible damages based analogous theories of recovery, such as upon a negligent failure to audit retirement plan assets, *Anoka Orthopaedic Assocs. v. Mutschler*, 773 F. Supp. 158, 170-71 (D. Minn. 1991) (applying Minnesota law); *cf. Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25, 2004) (applying New Jersey law), and breach of fiduciary duty by a trustee of a qualifying Employee Retirement Income Security Act ("ERISA") plan, *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("[T]he measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the . . . investment with what the Plan would have earned had the funds been available for other Plan purposes.").

*LLC* (*In re BLMIS*), 424 B.R. 122, 133-35 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011) (permitting defrauded investors to recover only their net investment losses)

But WNB has cited no authority imposing such a restriction on contract or tort claims.  Analysis from the BLMIS liquidation proceedings suggests that such a restriction does not apply with a solvent defendant, like WNB, instead of a limited fund.  *In re BLMIS*, 445 B.R. 206, 229 (Bankr. S.D.N.Y. 2011) (distinguishing the award of lost investment income as lost profits damages in *Visconsi v. Lehman Bros., Inc.*, 244 F. App'x. 708, 713 (6th Cir. 2007), because, among other reasons, "[the defendant] was solvent and had assets of its own to satisfy the arbitration award, [so] enforcing the award against [the defendant] would not, unlike here, be to the detriment of other investors.").  In the absence of any authority, much less binding authority, counseling in favor of excluding lost investment income damages in these circumstances, this Court will adhere to the long-standing Connecticut rule permitting consideration of lost profits damages in connection with Plaintiff's claims which are predicated on WNB's failure to audit.

Plaintiffs have asserted a non-speculative theory of damages predicated on WNB's failure to audit.  Plaintiffs argue that had WNB audited BLMIS and discovered discrepancies or possibly the fraudulent Ponzi scheme itself, the Plaintiffs would not have continued to invest in BLMIS and instead withdrawn their funds and pursued other investment opportunities.  Further, the Plaintiffs have presented evidence that, had they invested in a bona fide investment vehicle

instead of BLMIS, their investments would have appreciated.  (*See generally* Merschmann Decl. Ex. 67.)  This evidence creates an appropriate jury issue as to whether and to what extent the Plaintiffs may recover lost investment income if they succeed on their claims for relief.  Accordingly, summary judgment limiting the Plaintiffs' ability to recover lost investment income as damages is not proper, and the Plaintiffs may permissibly seek to recover lost profits damages in the form of lost investment income at trial in connection with their claims that WNB was obligated to and failed to audit BLMIS.[15]

### 2.    Economic loss rule

_____

[15] The Plaintiffs argue that the best measure of their lost investment income is reflected in the value stated in each Plaintiffs' last statement showing the purported value of his BLMIS investment.  (Pl.'s Opp. to WNB's Mot. for Summ. J. at 47-51.)  Although WNB concentrated on its argument that lost profits damages are unavailable here, WNB argued briefly in its reply memorandum that there is no evidence in the record sufficient for a reasonable juror to conclude that the final account statements are the best measure of lost profits.  WNB argues that to permit recovery based on the final account statement would result in the impermissible awarding of speculative damages.  See *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 70, (1998) ("In order to recover lost profits ... the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty" ).  This Court agrees that Plaintiffs' final account statement damages theory is speculative in the sense that Plaintiffs cannot establish that the losses incurred as a result of Madoff's falsely reported returns on their investments were caused by WNB as opposed to Madoff.  Consequently, Plaintiffs' final account statement theory is premised on an entirely conjectural causal relation between its purported lost profits and WNB's conduct.  As a consequence, Plaintiffs may not introduce evidence of the final account statement as a measure of lost profit damages at trial.  Instead, Plaintiff may introduce evidence that, had they invested in a bona fide investment vehicle instead of BLMIS, their investments would have appreciated to establish loss profits at trial.

WNB argues, based on the economic loss rule, that the Plaintiffs may not recover on their tort claims because the relationship between the parties is exclusively contractual and the Plaintiffs only allege economic injury.  (WNB's Mem. in Supp. of Mot. for Summ. J. at 41-43.)  Because the Plaintiffs have produced sufficient evidence of liability and damages to maintain separate contract and tort causes of action through the summary judgment stage, this Court concludes that the economic loss rule does not bar the Plaintiffs' tort claims at this point.

In general, Connecticut law permits contract and tort claims to coexist. *See Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 579, 657 A.2d 212 (1995) ("The [plaintiffs] were not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim."); *Johnson v. Flammia*, 169 Conn. 491, 496, 363 A.2d 1048 (1975) ("A party may be liable in negligence for the breach of a duty which arises out of a contractual relationship.").  The Connecticut Supreme Court has held that the economic loss rule, an exception to this general principle, prevents a plaintiff bringing a claim based on a contract for the sale of goods from also seeking to recover on a negligent misrepresentation theory.  *Flagg Energy Development Corp. v. General Motors Corp.*, 244 Conn. 126, 153, 709 A.2d 1075 (1998). The Connecticut Supreme Court has declined to clarify whether and to what extent the economic loss rule applies in other circumstances.  *See American Progressive Life & Health Ins. Co. of New York v. Better Benefits, LLC*, 292 Conn. 111, 118-19, 971 A.2d 17 (2009).

This Court has previously concluded that, at the motion to dismiss stage, the general rule permitting simultaneous contract and tort claims allows "a plaintiff [to] pursue contract and tort claims simultaneously as long as the plaintiff has alleged sufficient facts and damages to maintain separate contract and tort causes of action." *Factory Mut. Ins. Co. v. Pike Co., Inc.,* No. 3:08-cv-1775 (VLB), 2009 WL 1939799, at *3 (D. Conn. July 6, 2009).  This Court concludes that the same principle should apply at the summary judgment stage. Accordingly, because the Plaintiffs here have presented evidence sufficient for both their contract and tort claims to survive summary judgment separately, this Court similarly declines to restrict them to their contract remedies at this stage.

   3.  Statute of limitations

    a.  Contract

WNB argues that the six-year statute of limitations on contract claims found in Conn. Gen. Stat. Ann. 52-576(a) has run on all of the Plaintiffs' claims for fees paid to WNB prior to December 2, 2003.  (WNB's Mem. in Supp. of Mot. for Summ. J. at 52-54.)  Because the Plaintiffs' claims arise out of a contract for ongoing services and a continuing course of conduct breaching that contract, WNB's argument fails.

"No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues."  Conn. Gen. Stat. Ann. 52-576(a).  "Connecticut permits its six-year statute of limitation for contract claims to be tolled where the breach constitutes

a continuing course of conduct."  *Air Brake Sys., Inc. v. TUV Rhineland of N. Am., Inc.*, 699 F. Supp. 2d 462, 474 (D. Conn. 2010) (citing *City of West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir. 1990); *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 150, 464 A.2d 18, 23 (1983)); *see also Skidmore, Owings, & Merrill v. Conn. Gen. Life Ins. Co.*, 25 Conn. Supp. 76, 93, 197 A.2d 83, 91 (Super. 1963) ("In considering the application of the [s]tatute of [l]imitations to this case, one must distinguish between a contract obligation, such as was undertaken by the plaintiff, providing for a continuing, indivisible responsibility for the attainment of an end result, and a contract for the performing of a specific, definable act.").

Here, the custodial agreement was clearly a contract for ongoing services; it provides for its continuous operation until one of the parties terminates it upon 90 days written notice to the other party.  (Whatley Decl. Ex. 49, at 2.)  WNB administered the custodial relationship and charged its ongoing fees based on this ongoing relationship.  Accordingly, WNB's obligations under the contract were ongoing, and WNB's conduct pursuant to those obligations constituted part of a continuing course of conduct which continued at least until the BLMIS fraud was revealed.  The Plaintiffs' contract cause of action therefore did not accrue until well after February 13, 2003, and this Court concludes that the Plaintiffs' claims based on breaches of contractual duties prior to February 13, 2003 are timely.

    b.    CUTPA

61

Finally, WNB argues that the three-year statute of limitations on CUTPA claims found in Conn. Gen. Stat. Ann. 42-110g(f) has run on all of the Plaintiffs' claims for CUTPA violations occurring prior to February 13, 2006.  (WNB's Mem. in Supp. of Mot. for Summ. J. at 52-54.)  WNB, cites to *Flannery v. Singer Asset Finance Co., LLC*, 128 Conn. App. 507, 508, 17 A.3d 509 (2011), *cert. granted* 302 Conn. 902, 23 A.3d 1242 (2012), for the proposition that "[the Connecticut] Supreme Court has stated that the continuing course of conduct doctrine does not toll the three year statute of limitations set forth in § 42–110g(f)."  Although the *Flannery* cited *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 216-17, 541 A.2d 472 (1988) for this proposition, *Fichera* appears to hold that such a determination is factual rather than purely legal.  *See* 207 Conn. at 209 ("To support a finding of a 'continuing course of conduct' that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto.").

The Connecticut Supreme Court has granted certification on this precise issue.  *Flannery v. Singer Asset Finance Co., LLC*, 302 Conn. at 902 (granting petition for certification on question "2. Did the Appellate Court properly determine that the three year statute of limitations period for actions brought under the Connecticut Unfair Trade Practices Act, General Statutes § 42–110a et seq., cannot be tolled?").  Accordingly, given the tension between these two authorities, the Court deems it appropriate to delay resolution of this question until the Connecticut Supreme Court has spoken on the matter.

## IV.   Conclusion

As stated and for the reasons articulated above, the Plaintiffs' motion [Dkt. # 354] is DENIED IN PART and GRANTED IN PART and WNB's amended motion [Dkt. # 372] is GRANTED IN PART and DENIED IN PART.  WNB's earlier motion for summary judgment, superseded by the amended motion [Dkt. #358] is DENIED AS MOOT.  In Sum, the Court has granted summary judgment in favor of WNB on the (i) breach of contract claim based on WNB's administration of the custodial clearing accounts through the comingling of funds; (ii) breach of contract claim based on WNB alleged breach of Paragraph 7 of the custodial agreement; and (iii) Plaintiffs' CUPTA claim on the basis of WNB's violation of IRS regulations.  The Court grants summary judgment in favor of Plaintiffs on their unjust enrichment and money had and received claims.  The following claims remain extant for trial: (i) breach of contract based on WNB's calculation of fees based on "assets"; (ii) breach of contract based on WNB's failure to maintain adequate records and statements; (iii) breach of fiduciary duty; (iv) negligence and (v) Plaintiffs' CUPTA claim on the basis of WNB's violation of OCC regulations.

IT IS SO ORDERED.

_____/s/ _____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: September 28, 2012